394 A.2d 1036

**COMMONWEALTH of Pennsylvania**

v.

**Norman H. BERTELS, Jr., W. Kirk Hammaker, and Donald L. Parker, Appellants.**

Superior Court of Pennsylvania.

Argued March 15, 1977.

Decided Nov. 30, 1978.

Louis Lipschitz, Philadelphia, with him Sidney L. Krawitz, Milford, for appellants.

Glenn F. Gilman, Deputy Attorney General, Harrisburg, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This is an appeal from judgments of sentence for embezzlement by officers of an insurance company, fraudulent conversion, destroying or mutilating the books of a corporation, and conspiracy.[1]

National Capital Insurance Company was incorporated under the laws of the District of Columbia; it never registered in Pennsylvania, and its only office was in the District of Columbia. A majority of National Capital's stock was owned by Bankers Allied Mutual Insurance Company, a Pennsylvania corporation with its office in Gettysburg, Adams County. On November 24, 1965, as the result of an exchange of stock between Bankers Allied and Bankers & Telephone Employees Insurance Company, also a Pennsylvania corporation with its office in Gettysburg, Bankers & Telephone acquired the majority of National Capital's stock.

There was substantial overlap in the management of the three corporations. Appellants were officers and members of the board of each corporation, and constituted the investment committee of National Capital and Bankers Allied. They also controlled Tower Investments, Inc., a Georgia corporation, which figured in the two transactions that led to the present case.

The first transaction was National Capital's purchase of 266,285 shares of Steel Crest Homes, Inc., at $3 per share. To finance this purchase, National Capital sold some securi-

1. Act of June 24, 1939, P.L. 872, §§ 828, 834, 846 and 302 respectively; 18 P.S. §§ 4828, 4834, 4846 and 4302 respectively.

ties through a New York broker. The broker sent the proceeds of the sale, some $835,000, to National Capital's account in the Bank of Virginia, in Norfolk, Virginia. National Capital's books matched a November 30, 1965, disbursement of $850,000.50 (purchase price plus brokerage and legal fees) with the acquisition of the Steel Crest shares on December 1, 1965. However, apparently the sellers of the Steel Crest shares were in fact not paid with the proceeds of the sale of the securities. Instead, Bankers Allied transferred $400,000 from an account in the Gettysburg National Bank to an account in Bankers Allied's name in the Bank of Virginia. That money was then transferred to Tower Investment's account in the Philadelphia National Bank in Philadelphia. Tower bought 300,000 shares of Steel Crest, and paid the sellers $337,500 in cash, and the balance in Tower's notes.[2] Of these 300,000 shares, 266,285 were transferred to National Capital.

The National Capital account, in which the proceeds of the sale of securities had been deposited, was virtually empty by October 28, 1965, and was closed in December. There was no evidence of what in fact became of the proceeds.

The second transaction involved the purchase by Bankers Allied of additional Steel Crest shares. Bankers Allied paid Tower $101,145 cash for 33,715 shares (the number of shares Tower had left, after its sale of shares to National Capital in the first transaction). The Bankers Allied board approved that purchase and directed a further purchase of 83,333 more shares direct from Steel Crest without going through Tower. The resulting contract with Steel Crest provided that as payment for these shares Steel Crest would accept a $250,000 certificate of advance of surplus, which Bankers Allied had previously made out to Parham General Agency, Inc. (also controlled by appellants), and which Parham agreed to assign to Steel Crest.[3]

2. The sellers later received a guarantee bond from Bankers & Telephone, guaranteeing payment of the balance.

3. This certificate guaranteed payment from surplus if such surplus was raised sometime in the future. The certificate was made out to

In spite of these arrangements, however, the books and records of Bankers Allied reflected the disbursement of $351,000 from Bankers Allied's account in the Bank of Virginia, with $101,144 of that amount noted as the payment for the 33,715 shares bought through Tower, and $250,000 noted as the payment for the 83,333 shares bought direct from Steel Crest. As in the first transaction, there was no evidence of what in fact became of the "earmarked" money in the Bank of Virginia account; indeed, as to this transaction, there was no evidence whether it ever left the account.

With respect to neither transaction did the Commonwealth show any activities by appellants other than that they were corporate officers, participated at corporate meetings concerned with the purchase of the various shares, and acted in carrying out the decisions of the board (for example, appellants negotiated the agreement with Tower and the seller of the Steel Crest shares; they signed various checks used in carrying out the stock purchases).[4]

In substance, then, the Commonwealth's case came down to this: Appellants (i. e., corporations controlled by them) bought Steel Crest shares. According to appellants' books, the money to do this went into two accounts in Virginia. The sellers of the shares, however, were not paid with that money; and the money in one of the accounts, at least, has disappeared. Therefore, appellants must have misappropriated the money, and have falsified the books. Given the Commonwealth's failure to prove any actual misappropriation, it is plain that a serious question of sufficiency of evidence is presented, which appellants have argued. However, we do not reach that question, for we have concluded that the Commonwealth failed to prove that the court in

Parham in return for a $250,000 cash payment by Parham to Bankers Allied.

**4.** One appellant, however, did order the $400,000 in Bankers Allied funds transferred from Gettysburg to a company account in Virginia. *See infra* at 5.

Adams County had jurisdiction to try appellants for the offenses charged.[5]

It is, of course, the law that "the locus of a crime is always in issue, for the court has no jurisdiction of the offense unless it occurred *within the county of trial*, or unless, by some statute, it need not . . . .": *Commonwealth v. Mull*, 316 Pa. 424, 426, 175 A. 418, 419 (1934). *Commonwealth ex rel. Chatary v. Nailon*, 416 Pa. 280, 283, 206 A.2d 43, 45 (1965) (emphasis supplied). In order to sustain a guilty verdict, the Commonwealth must introduce evidence of the place of the crime; and while the place of the crime may be proved circumstantially, it may not be the product of mere speculation. *See Commonwealth ex rel. Chatary v. Nailon, supra.*

A charge of embezzlement or fraudulent conversion may be tried in any county in which any part of the embezzlement or fraudulent conversion was committed, or where, upon being called to account, the defendant disowned having received the money. *Commonwealth v. Sexton*, 107 Pa.Super. 69, 162 A. 678 (1932).

In this case, there was no "disowning," and, as the lower court recognized, "Most, if not all, of the transactions took place outside of Adams County." Lower court opinion at 16. Appellants lived in Virginia. All meetings pertaining to

---

**5.** At trial, appellants demurred on grounds of lack of jurisdiction as to the first transaction only. (In post-trial motions they broadened their challenge to jurisdiction to include the entire case.) However, appellants have not waived their right to challenge jurisdiction, because the question of venue between the counties has been treated as one of subject matter jurisdiction. *Commonwealth v. Ziegler*, 251 Pa.Super. 147, 380 A.2d 420 (1977); *Commonwealth v. Creamer*, 236 Pa.Super. 168, 345 A.2d 212 (1975); *Commonwealth v. Simeone*, 222 Pa.Super. 376, 294 A.2d 921 (1972); *see Commonwealth v. Little*, 455 Pa. 163, 314 A.2d 270 (1974) (jurisdiction is of two sorts: subject matter and personal jurisdiction; opinion makes no distinction between subject matter and venue jurisdiction). Since subject matter jurisdiction goes to the very power of the court to act, it may be raised at any time during the proceedings, even by this court *sua sponte. Commonwealth v. Little, supra*; *Daly v. Darby Township School Dist.*, 434 Pa. 286, 252 A.2d 638 (1969); *Commonwealth v. Ziegler, supra*; *Commonwealth v. Mangum*, 231 Pa.Super. 162, 332 A.2d 467 (1974).

National Capital took place in the District of Columbia. The bank accounts in which the funds in question were deposited—and out of which, the Commonwealth contends, they were expended—were in Virginia. The securities sold by the broker in New York were before the sale kept in Virginia. The purchase of the 300,000 shares of Steel Crest was negotiated and closed in Philadelphia.

As regards Adams County: Testimony showed that the $400,000 of Bankers Allied money involved in the first transaction was taken, at order of one of the appellants,[6] out of the Gettysburg National Bank, in Adams County, and transferred to the Bank of Virginia. National Capital's books and records were in Gettysburg from March 1965 until shortly after appellants became officers and board members of National Capital, on July 8, 1965, after which time the books were in Washington. Bankers Allied was a Pennsylvania corporation with its office in Gettysburg. Appellants attended meetings there during which the following events occurred: Appellants were elected officers and board members of Bankers Allied (July 9, 1965); appellants reported to the board the $250,000 cash offer from Parham, and the board resolved to offer Parham in return a certificate for advance to surplus (October 27, 1965); and appellants recommended, and the board ordered, the purchase of Steel Crest shares by Bankers Allied (December 30, 1965).[7]

We find these Adams County activities only incidental to the crimes of embezzlement and fraudulent conversion, both of which focus on the defendant's action upon another's funds for his own use. The funds were in accounts in Virginia; it was from those accounts that they are alleged to have disappeared.

6. There was no testimony as to where the appellant was when he gave the order.

7. In addition appellants introduced minutes of a meeting of the Bankers & Telephone board in Gettysburg on July 9, 1965, at which appellants were elected board members and officers of that corporation also.

> In many cases requisite elements of the completed crime may be committed in different jurisdictions, and in such cases any state in which an essential part of the crime is committed may take jurisdiction. *It is necessary, however, to discriminate with great care between acts essential to the crime and acts merely incidental thereto.* For example, the mere forwarding of money from one state to another for the purchase of futures, for wagering on a horse race, or for any similar transaction forbidden by the laws of the former state, does not constitute a crime punishable therein, although it is otherwise if the statute makes the forwarding of the money, and not merely the transaction itself, a crime.
>
> 4 *Wharton's Criminal Law and Procedure* § 1507 at 88 (1957) (emphasis supplied; footnotes omitted).

*Compare, Simmons v. Commonwealth*, 5 Binn. 617 (1813) (one who steals goods in another state and brings them into this one cannot be found guilty of larceny, although might be found guilty under a statute prohibiting the bringing of stolen goods into state).

The lower court held that it had jurisdiction on the theory, not that the substantive offenses occurred in Adams County, but that the embezzlement worked a fraud on an Adams County corporation,[8] and that appellants had a duty to account for the funds in Adams County. However, in *Commonwealth v. Creamer*, 236 Pa.Super. 168, 345 A.2d 212 (1975), this court rejected a theory of jurisdiction on the basis of where the effect of the crime is ultimately felt. There, the defendant was charged with withholding evidence and obstruction of justice in connection with a homicide in Crawford County. His duty to disclose the evidence did not arise in Crawford County, nor did he do any acts there, but he was tried there. The Commonwealth argued

8. The court addressed jurisdiction only as to the first transaction, and decided that Bankers Allied was affected as the parent company of National Capital. Bankers Allied was directly affected in the second transaction, so the lower court's theory would confer jurisdiction as to that transaction also.

that Crawford County was where the effect of his alleged actions and inactions was felt. In denying jurisdiction, we said:

We do not agree with the Commonwealth that a person may be tried for obstruction of justice where the alleged effect occurred. The "tracing" of crimes has not been adopted in this Commonwealth . . . .

236 Pa.Super. at 172, 345 A.2d at 214.[9]

Nor did the Commonwealth prove jurisdiction with respect to the charges of falsifying Bankers Allied's books and conspiracy.[10]

Appellants objected to the trial court's instruction that venue need only be found by a preponderance of the evidence, rather than beyond a reasonable doubt. However, we need not resolve this dispute. The only basis upon which the jury could have found venue was the evidence that the corporation's offices were in Gettysburg. There was no evidence of where the corporate books were or of where any falsifying took place, or of who made the entries alleged to be false. On evidence so slight, a finding of the place of the

9. In contrast, jurisdiction may be conferred by acts that are committed outside a jurisdiction but produce an immediate, substantial impact within the jurisdiction. *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973) (jurisdiction where victim, shot on federal territory, died in Philadelphia); *Commonwealth v. Thomas*, 410 Pa. 160, 189 A.2d 255, *cert. denied*, 375 U.S. 856, 84 S.Ct. 118, 11 L.Ed.2d 83 (1963) (conspirator never entered Commonwealth but jurisdiction found because other conspirators did, and committed crimes in furtherance of conspiracy).

It is a well established theory of the law that, where one puts in force an agency for the commission of the crime, he, in legal contemplation, accompanies the same to the point where it becomes effectual . . . .

*Commonwealth v. Thomas, supra*, 410 Pa. at 167, 189 A.2d at 259. It is clear that any embezzlement involved in this case "be[came] effectual" without reference to the place where the ownership interests were located.

10. A demurrer to the charge of falsifying National Capital's books was granted because the lower court found no evidence that the books of the Washington, D.C. corporation were falsified in Adams County.

crime would be the product of speculation. *See Commonwealth ex rel. Chatary v. Nailon, supra.*

Under the Penal Code of 1939, a charge of conspiracy could be brought either in the county where the unlawful confederacy was formed or where an overt act was committed by any of the conspirators in furtherance of the unlawful confederacy. *Commonwealth v. Thomas, supra.* As we have discussed, there is virtually no evidence of any of appellants' activities other than their participation at board meetings and their functioning in their capacity as corporate officers. It is, to be sure, true that usually a conspiracy must be proved circumstantially; the circumstances proved, however, must be such as to permit an inference, strong enough to be accepted beyond a reasonable doubt, that the parties did agree to act together. *Commonwealth v. Yobaggy,* 410 Pa. 172, 188 A.2d 750 (1963); *Commonwealth v. Holman,* 237 Pa.Super. 291, 352 A.2d 159 (1975). Typically such proof is accomplished by evidence that one party did a particular act, and that the other party did another act of such a sort and at such a time as to show confederacy; for example, evidence that one party entered a store with a gun, and that the other waited outside in an automobile with the engine running. Here, there was no such particular, or individualized, proof, the Commonwealth instead seeming to rely on evidence of appellants' status as corporate officials. This was not enough to permit an inference that appellants had agreed to an unlawful confederacy, much less than that they had agreed to it in Adams County. Without proof of a conspiracy, we cannot find jurisdiction in Adams County on the basis of overt acts committed there in furtherance of conspiracy.

The judgments of sentences are reversed.

VAN der VOORT, J., dissents.

WATKINS, former President Judge, and HOFFMAN, J., did not participate in the consideration or decision of this case.