435 A.2d 592

COMMONWEALTH of Pennsylvania

v.

Charles W. OHLE, Appellant (two cases).

COMMONWEALTH of Pennsylvania

v.

Ronald J. JACKSON, Appellant.

Superior Court of Pennsylvania.

Argued March 5, 1980.

Filed Sept. 25, 1981.

Petition for Allowance of Appeal Granted Feb. 18, 1982.

Smith B. Gephart, Harrisburg, for appellants.

Marion E. MacIntyre, Assistant District Attorney, Harrisburg, for Commonwealth, appellee.

Before CERCONE, President Judge, and WATKINS and MONTGOMERY, JJ.

CERCONE, President Judge:

Appellants Ohle and Jackson were charged with theft by failure to make required disposition of funds received,[1] bribery in official and political matters,[2] and conspiracy to commit bribery.[3] In June of 1977 Ohle and Jackson were tried jointly on the theft charges. The Commonwealth won convictions on those charges against both men. Each was subsequently sentenced to the payment of a fine of $1,000 plus the costs of his prosecution, restitution to the Commonwealth of $304,500.00, and to a term of imprisonment of from three to five years. Ohle has appealed the judgment of sentence against him at No. 106 March Term, 1978. Jackson has appealed the judgment of sentence against him at No. 103 March Term, 1978.

On the conspiracy and bribery charges a joint trial was begun November 15, 1977. Jackson became ill during this trial, was ruled unable to continue, and a mistrial motion was granted in his favor. As to Ohle, however, the trial continued. He was convicted on both the conspiracy and the bribery counts. For the conspiracy conviction the court sentenced Ohle to payment of a fine and a term of imprison-

1. 18 Pa.C.S. § 3927.

2. 18 Pa.C.S. § 4701.

3. 18 Pa.C.S. § 903.

ment of from one to two years, to run concurrently with the prison sentence imposed in the theft case. On the bribery conviction the court imposed on Ohle a sentence of six to twelve months imprisonment, which was also to run concurrently with the other prison sentences imposed for the theft and conspiracy convictions, and it also imposed a fine of $500. He has appealed from the convictions on the conspiracy and bribery charges.

Because these three appeals, two by Ohle and one by Jackson, are based generally on the same facts, they were consolidated for purposes of briefing and argument. For convenience sake, we have set out the facts in a single narrative. However, we discuss the legal issues presented separately.

## I.

Appellants Ohle and Jackson were insurance brokers with both the firms of Charles W. Ohle, Inc. and O. & R. Excess, Inc., which were brokerages licensed to do business in New York. Charles W. Ohle, Inc., was licensed to do business in Pennsylvania as well. Prior to June 30, 1972 Anthony J. Trucco, then Director of the Commonwealth's Bureau of Insurance and acting pursuant to a plan developed by Frank C. Hilton, then the Commonwealth's Secretary of Property and Supplies, arranged for the renegotiation of the insurance policy covering the Commonwealth's 26,000 automobile fleet. The policy was renegotiated because Trucco and Hilton saw in it a likely opportunity to provide them with an illegal source of revenue through the appointment of a broker who would provide them with a kickback from part of the broker's commission. In February of 1973 Trucco met appellants and discussed the kickback scheme. He told them that the appointment could only be made by Hilton but that he would recommend them to Hilton. He did not reveal Hilton's connection with the scheme. Appellants agreed to the kickback scheme as outlined to them by Trucco. Later that month Hilton appointed appellants' firm, Charles W. Ohle, Inc., broker of record on the renegotiated automobile insurance policy.

The first premium payment in question was delivered to an agent of appellants' in Harrisburg on July 25, 1974 and transported to New York. It was in the form of a check in the sum of $500,000 and made payable to Charles W. Ohle, Inc. and Market Facilities, Inc. (Market Facilities, Inc. was an affiliate of the insurance company which actually carried the policy.) An officer of the insurance company purportedly gave appellant Ohle authority to endorse the Commonwealth's premium checks for Market Facilities. This first check of $500,000 was endorsed by Ohle pursuant to this purported authority, and by his firm, and deposited in a firm account. A second check in the amount of $300,000 was delivered to an agent of appellants in Harrisburg and transported to New York on August 5, 1974. It too was endorsed by Ohle pursuant to the same authority, and by his firm, and deposited in a firm account. Rather than turning the premiums less broker's commission immediately over to the insurance company the $800,000 was used by appellants as collateral on a short term loan from a Florida bank. For unexplained reasons appellants defaulted on the Florida loan and the bank seized the collateral. The $800,000 never reached the insurance company's coffers and it eventually cancelled Pennsylvania's automobile fleet insurance policy.

Shortly after the cancellation of the insurance policy an article appeared in a Harrisburg newspaper concerning a claim by one Mr. Devine, a former employee of Ohle, that he had knowledge of a bribery scheme between Ohle and Jackson on one side and Hilton and Trucco on the other. On the same day, an FBI agent visited the offices of the Commonwealth's Department of Justice and notified state authorities of the federal investigation. Acting upon this information, Edward Golla, Chief Investigator for the Pennsylvania Department of Justice began an investigation. Soon Golla had in his possession statements by Noel Bernard, an employee of the insurance company, pertaining to the theft, bribery and conspiracy charges, as well as statements by other Commonwealth employees concerning appellants' participation in the scheme. Subsequently, appellants were

granted use immunity pursuant to the federal statutes by the U.S. District Court for the Middle District of Pennsylvania. *See* 18 U.S.C. § 6002. The Commonwealth's investigation continued; investigators received statements by Trucco which further implicated appellants in the bribery and conspiracy scheme. The appellants thereupon entered into a plea bargain with the district attorney of Dauphin County. On the basis of the plea bargain appellants waived their extradition and were arraigned on the charges brought against them. Appellants later gave statements to the district attorney and in federal court at the trial of Frank C. Hilton, former Secretary of the Department of Property and Supplies. Subsequent thereto the grand jury of Dauphin County approved Bills of Indictment against them. Thereafter the district attorney notified appellants of his decision to withdraw the plea bargain and to prosecute them fully. Appellants made divers and diverse pre-trial motions, among which was a motion to quash the indictments because they were allegedly based on information gained as part of the withdrawn plea bargain. The court held that the evidence presented to the grand jury had been independently gathered and therefore refused to quash the indictments. Trials on the various charges were held in June and October of 1977, which resulted in the convictions of appellants as above set out. These appeals followed.

## II.

Appellants have assigned numerous errors. Because of the disposition we make today of these cases, we need not consider all the questions raised.[4]

4. Appellants' brief lists the following questions on appeal:
　1. Did the Court of Common Pleas, Dauphin County, have jurisdiction since the crime of Theft, if committed, occurred in the State of New York?
　2. Did the authorized endorsement of premium checks by the payee insurance company constitute payment to the insurance company?
　3. Did the Court err in refusing to grant a mistrial after revealing its decision on Appellants' demurrer to the news media, which decision was published and read and heard by several jurors?

A.

We address first the question of whether the court erred in refusing to quash the indictments. Appellants both contend that the indictments on all the counts should have been quashed because they contain substantive defects.[5] They argue that they were improperly indicted under the Crimes Code and that they should have been indicted under the Penal Code. They argue further that the indictments were in violation of Section 2 of the Act of December 6, 1972, P.L. 1482, No. 334, and that because violation of the Act of 1972 constitutes a substantive defect the indictments ought to have been quashed. Section 1 of the Act of December 6, 1972 amended Title 18 of the Pennsylvania Consolidated Statutes creating the Crimes Code of Pennsylvania. Section 2 of the Act is a savings clause which ensured the vitality of the Penal Code, and required prosecution under its provision of any crimes the elements of which arose before the Act's effective date. Section 2 of the Act reads:

Title 18 of the Consolidated Pennsylvania Statutes (relating to crimes and offenses), as added by this act, does not apply to offenses committed prior to the effective date of this act and prosecutions for such offenses shall be governed by the prior law, which is continued in effect for that purpose, as if this act were not in force. For the purposes of this section, an offense was committed prior to

4. Did the Court err in not suppressing Appellants' statements and records made pursuant to a written Plea Bargain which was subsequently unilaterally withdrawn by the Commonwealth?

5. Did the Court err in refusing to dismiss the prosecution because Appellants were charged under the Crimes Code rather than the Penal Code?

*6. Did the Court err in refusing to dismiss the charge of Conspiracy on grounds of merger?

*7. Did the Court err in refusing to dismiss the prosecution since only uncorroborated testimony of accomplices was introduced?

*8. Did the Court err in denying Appellant's Motion for Mistrial on the basis of Commonwealth witness's unresponsive reference to Appellant's prior criminal record?

* These questions pertain to appellant Ohle alone.

5. These arguments were made at all relevant stages of these proceedings and are thus preserved for our review.

the effective date of this act if any of the elements of the offense occurred prior thereto.

Act of Dec. 6, 1972, P.L. 1482, No. 334, § 2. Appellants contend that elements of the crimes of theft, bribery and conspiracy, of which they have been variously convicted, arose prior to the June 6, 1973 effective date of the Crimes Code. We begin by considering the indictments against Ohle on the bribery and conspiracy charges of which he was ultimately convicted,[6] and then we shall consider the indictments against both Ohle and Jackson on the charges of theft by failure to make required disposition of funds received.

### 1.

◼ Ohle contends that it was error to have refused to quash the indictments against him alleging violations of Crimes Code Sections 4701 (bribery) and 903 (conspiracy). His argument is based on the contention that elements of the alleged crimes arose prior to the effective date of the Crimes Code, and consequently that the indictments against him were faulty for their failure to allege violations under the Penal Code of 1968 rather than under the dictates of the Crimes Code of 1972. We agree and accordingly vacate the judgment of sentence relating to charges of bribery and conspiracy, reverse the conviction and quash the indictment against him.

◼ Pennsylvania Crimes Code Section 4701 reads:

### BRIBERY IN OFFICIAL AND POLITICAL MATTERS

(a) Offenses defined.—A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

(1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of

---

**6.** We do not express any opinion whatsoever concerning the propriety of the indictments brought against Jackson on charges of conspiracy and bribery. The Commonwealth's case against him on those charges resulted in a mistrial; there has been no appeal by Jackson on the order denying the motion to quash the indictments on those charges.

discretion as a public servant, party official or voter by the recipient;

(2) any benefit as consideration for the decision, vote, recommendation or other exercise of official discretion by the recipient in a judicial, administrative or legislative proceeding; or

(3) any benefit as consideration for a violation of a known legal duty as public servant or party official.

(b) Defenses prohibited.—It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office, had left office, or lacked jurisdiction, or for any other reason. 18 Pa.C.S. § 4701. Once the offer to confer the proscribed benefit, or once the agreement is made, the crime is complete. There need be no waiting for the benefit actually to be conferred. *Cf. United States v. Davis*, 576 F.2d 1065 (3rd Cir., 1978), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). Instantly, it is clear from the indictment itself, as well as from the evidence at trial, that the agreement to confer the proscribed benefit upon Trucco was reached no later than February of 1973, fully five months before the June 6, 1973 effective date of the Crimes Code provision. *See* Act of December 6, 1972, *supra.*

The Commonwealth argues that the elements of the offense prohibited by the Crimes Code and elements of the corresponding Penal Code offense are identical, and that therefore there was no defect, either informal or substantive, and hence that there arose neither the necessity of amending the indictment nor reason to quash it. We disagree. Section 4303 of the Penal Code reads in pertinent part:

Bribery of Government officers and employees; judges, jurors, etc.

Whoever shall directly or indirectly, or by means of and through any artful and dishonest device whatever, give or make any promise, contract or agreement, for the payment, delivery, or alienation of any money, goods or other

thing, in order to obtain or influence the vote, opinion, verdict, award, judgment, decree, or behavior of any member of the General Assembly, or any officer or employee of this Commonwealth, or of any political subdivision thereof, or any judge, juror, justice, referee or arbitrator, *in any bill, action, suit, complaint, indictment, controversy, matter or thing whatsoever, depending or which shall depend before him or them*, is guilty of bribery, a misdemeanor, and on conviction thereof, shall be sentenced to pay a fine not exceeding five hundred dollars ($500), or to undergo imprisonment by separate or solitary confinement at labor not exceeding one (1) year or both.

18 P.S. § 4303. (Emphasis added). The Penal Code provision permits an affirmative defense: in order for culpability to exist, the action sought to be influenced by the offeror of the bribe must be one which the offeree of the bribe could affect. The potential for an affirmative defense under Penal Code Section 4304 undeniably distinguishes it from Crimes Code Section 4701. The Commonwealth's failure to indict Ohle under the Penal Code clearly constituted a defect in the indictment. The prejudice which arises out of a defect in the indictment which denies a potential defense against the charges cannot be gainsaid.[7] Thus, it was error not to have quashed the bribery indictment. Likewise, since the conspiracy indictment is based on the same facts, and was brought under Crimes Code Section 903 and not under the Penal Code, it too should have been quashed and it was error not to do so.

### 2.

Ohle and Jackson were convicted of violating Crimes Code Section 3927 (theft for failure to make required disposition of funds received). Section 3927(a) reads:

**7.** Because the motion to quash was made pre-trial, an informal defect in the indictment could have been cured upon the proper motion, but the Commonwealth made no such motion. As for the propriety of amending a substantive defect in an indictment *see* Pa.R.Crim.P. 220; *and see Commonwealth v. Thomas*, 278 Pa.Super. 39, 419 A.2d 1344 (1980); *Commonwealth v. Jones*, 250 Pa.Super. 471, 378 A.2d 1245 (1977).

(a) Offense defined.—A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other dispositions, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required payment or disposition.

18 Pa.C.S. § 3927(a). This Court first considered Section 3927 in *Commonwealth v. Crafton*, 240 Pa.Super. 12, 367 A.2d 1092 (1976). In *Crafton* we outlined the elements of the crime which is theft by failure to make required distribution of funds received. The elements of the crime, as we stated them there are:

"1. The obtaining of property of another;

2. Subject to an agreement of known legal obligation upon the receipt to make specified payments or other disposition thereof;

3. Intentional dealing with the property obtained as the defendant's own; and

4. Failure of the defendant to make the required disposition of the property."

*Id.*, 240 Pa.Super. at 16, 367 A.2d at 1094–96. *And see Commonwealth v. Austin*, 258 Pa.Super. 461, 466, 393 A.2d 36, 38 (1978).

Appellants do not deny that they received the property of another; they fully acknowledge receipt of the premiums paid by the Commonwealth. Rather, their attack on the validity of the indictment charging them with the crime of theft by failure to make required disposition of funds received, as proscribed under Section 3927, goes to the second element of the offense: "subject to agreement or know legal obligation." Appellants contend that the legal obligation which made out this element of the offense is the agreement whereby they became brokers of record on the automobile

fleet insurance policy. In this they are correct. However, they also contend that since the agreement arose prior to June 6, 1973, and since it is an element of the offense, then they should have been charged under a provision of the Penal Code and not under Section 3927 of the Crimes Code. Although the argument is persuasive we cannot accept it. Logically, the occurrence which triggers the applicability of Section 3927 is not the initiating of a legal obligation, but rather, the receipt of the property of another pursuant to that obligation. Although the legal obligation must necessarily be pre-existing or co-eval, with the receipt of the other party's property, logically, no element of the crime could be said to arise until the property has exchanged hands pursuant to the agreement creating the obligation. Thus, in considering the time the crime began, that is, in order to determine whether prosecution under Section 3927 was proper, we must logically read the first two elements of the crime as delineated in *Commonwealth v. Crafton* as one element. Therefore, as regards the application of Section 2 of the Act of December 6, 1972 to Section 3927 of the Crimes Code there should be only three elements to consider:

1. obtaining property of another upon agreement or known legal obligation to make specified payment or other disposition;

2. intentional dealing with the property as one's own; and

3. failure to make the required disposition of the property.

Any other reading of said Section 3927 of the Crimes Code, as Section 2 of the Act of 1972 applies to it, would give a vitality and longevity to the Penal Code which the Legislature cannot rationally have intended.[8]

■ Appellants received the premium payments on July 25 and August 5, 1974. Receipt was made subject to a known

8. If we were to accept appellant's argument then the failure to dispose of another's property thirty years after the legal duty was created could still be prosecuted under the Penal Code if the agreement creating the duty so to do arose prior to the effective date of the Crimes Code.

legal obligation. As thus interpreted, no element of the offense arose prior to the effective date of the Crimes Code. Appellants were properly indicted under 18 Pa.C.S. § 3927 and thus there was no error in refusing to quash the indictments, at least insofar as the time element is concerned.

## B.

Appellants next assert that it was error not to have suppressed certain evidence. They contend this evidence came into the hands of the Commonwealth solely as a result of their cooperation with the Dauphin County District Attorney pursuant to the plea bargain agreement entered into April 26, 1975 and dishonored by the District Attorney January 13, 1976 for appellants alleged noncompliance with its terms. Although they have contended that this evidence should have been suppressed as to both the bribery and conspiracy indictments and the indictments for the theft for failure to make required disposition of funds received, our quashing of the bribery and conspiracy indictment against Ohle has obviated the need to consider the suppression question in regard to that indictment. Our discussion of this question thus applies only to the theft indictments.

As appellants have framed their question, we are asked to consider whether the suppression court erred in finding that the Commonwealth presented sufficient evidence to establish that the evidence presented to the Grand Jury, and later to the petit juries at trial, was restricted to the evidence placed under seal of court April 1, 1975, and contained nothing obtained subsequent to the plea bargain agreement.[9]

In suppression hearings the Commonwealth bears both the burden of going forward with the evidence, *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A.2d 426 (1968), *and see* Pa.R.Crim.P. 323(h), as well as the burden of persuasion, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *and see Commonwealth ex*

---

**9.** For the exact wording of the questions presented see footnote 4, question 4.

*rel. Butler v. Rundle, supra.* The standard by which we measure sufficiency of the evidence in suppression hearings is that of preponderance of the evidence. *Commonwealth ex rel. Butler v. Rundle, supra.* It is clear from the record of the suppression hearing that the Commonwealth met its burden by a preponderance of the evidence. There was no error in refusing to suppress evidence because it was clearly established that it was properly obtained and untainted.[10]

## C.

The last question we address pertains solely to Ohle and Jackson's convictions for theft. The question raised is jurisdiction, and the assertion made is that if a crime occurred it occurred in New York and not in Pennsylvania, and that therefore the courts of the Commonwealth have no jurisdiction to try the case.

The common law rule of subject matter jurisdiction in criminal matters was that a prosecution could not be brought unless the "gist" of the offense occurred within the prosecuting jurisdiction. *See* Comment to Section 1.03, Model Penal Code, T.D. 5, (from which 18 Pa.C.S. § 102 is derived). Often, as in the case of common law larceny, legal fictions were created which altered the essential elements of the offense to permit prosecution in the county where the defendant was apprehended instead of where the crime actually occurred. The courts of this Commonwealth long ago rejected the notion that these legal fictions, or non-es-

---

10. Because of the way in which appellants have framed the question on appeal we need not consider the propriety of the District Attorney's action in withdrawing the plea bargaining agreement. However we note with interest the following:

> On the merits, our view is that in a plea bargain the government's obligation to make a recommendation arises only if defendant performs his obligation (in this instance, full disclosure), but the question whether defendant did in fact fail to perform the condition precedent is an issue not to be finally determined unilaterally by the government, but only on the basis of adequate evidence by the Court... There would be manifest impropriety in permitting the government, without satisfying a judge that the evidence provides that a defendant broke his promise, to escape from the obligation the government undertook in the plea bargain.

*United States v. Simmons*, 537 F.2d 1260, 1261 (4th Cir. 1976).

sential elements of the offense, could give rise to subject matter jurisdiction in our courts where the essential elements of the crime occurred in another state. *Commonwealth v. Simmons*, 5 Binn. 617 (1813) (one who steals goods in another state and brings them into this one cannot be found guilty of larceny, although one might be found guilty of bringing stolen goods into this state if statute so provided). We recently had occasion to discuss much the same question in *Commonwealth v. Bertels*, 260 Pa.Super. 496, 394 A.2d 1036 (1978), *aff'd* 491 Pa. 189, 420 A.2d 405 (1980). There we quoted from the authorities on the question of subject matter jurisdiction in criminal cases:

> In many cases requisite elements of the completed crime may be committed in different jurisdictions, and in such cases any state in which an essential part of the crime is committed may take jurisdiction. *It is necessary, however, to discriminate with great care between acts essential to the crime and acts merely incidental thereto.* For example, the mere forwarding of money from one state to another for the purchase of futures, for wagering on a horse race, or for any similar transaction forbidden by the laws of the former state, does not constitute a crime punishable therein, although it is otherwise if the statute makes the forwarding of the money, and not merely the transaction itself, a crime. 4 *Wharton's Criminal Law and Procedure* § 1507 at 88 (1957) (emphasis supplied; footnotes omitted).

*Id.*, 260 Pa.Super. at 502, 394 A.2d at 1039. *See also* 21 Am.Jur.2d, Criminal Law § 385.

## 1.

### Jurisdiction in Criminal Matters.

The territorial applicability of the Pennsylvania Crimes Code is set out in Section 102; the section defines the territorial scope of the Crimes Code and delimits the exercise of subject matter jurisdiction in criminal matters by our courts. As that section relates to the prosecution of appellants under Crimes Code Section 3927 the Commonwealth argues the following provisions are pertinent:

§ 102. Territorial applicability

(a) General rule.—Except as otherwise provided in this section, a person may be convicted under the law of this Commonwealth of an offense committed by his own conduct or the conduct of another for which he is legally accountable if either:

> (1) the conduct which is an element of the offense or the result which is such an element occurs within this Commonwealth;

> \* \* \* \* \* \*

> (5) the offense consists of the omission to perform a legal duty imposed by the law of this Commonwealth with respect to domicile, residence or a relationship to a person, thing or transaction in this Commonwealth; . . .

18 Pa.C.S. § 102(a)(1) & (5). We may eliminate Section 102(a)(5) as a potential basis for the exercise of jurisdiction since it is clear that subsection 5 was intended to reach outside the territorial limits of Pennsylvania to prosecute those who had a duty or obligation which must necessarily have been performed within our boundaries and failed to do so. *See* Comment to Section 1.03, Model Penal Code, T.D.5, pp. 7–8; *see also* S. Toll, *Pennsylvania Crimes Code Annotated,* § 102 at 6 (1974).[11] The remaining statutory basis for the exercise of jurisdiction in this case is Section 102(a)(1) which provides for subject matter jurisdiction where an element of the proscribed activity occurs within the Commonwealth. The essential elements of the offense prohibit-

---

**11.** For an excellent example of the type of criminal statute to which 18 Pa.C.S. § 102(a)(5) would be applicable compare Pennsylvania's criminal non-support statute, 18 Pa.C.S. § 4322 with Georgia's, Ga. Code Ann. § 74–9902, which makes the misdemeanor of abandonment of one's child a felony if the parent leaves the state. *Cf. Jones v. Helms,* 452 U.S. 412, 101 S.Ct. 2434, 69 L.Ed.2d 118 (1981), (the distinction between abandonment of child and abandonment of child coupled with absconding from the jurisdiction does not violate the Equal Protection clause). *And cf. Commonwealth v. Klimen,* 10 Pa.D & C 3d 256 (1979) (in personam jurisdiction over out-of-state father permissible, but denies jurisdiction on basis of forum non conveniens.)

ed by Section 3927 are: 1) receipt of another's property, 2) subject to agreement or known legal obligation, 3) the intentional dealing with the property as the recipients own, 4) and failure to make disposition of the property required by the agreement or legal obligation. See *Commonwealth v. Crafton, supra.*[12]

Appellants argue that the first two elements are merely incidental to the crime charged. Their argument is two-pronged. First, they argue that the exercise of jurisdiction under Section 102 requires that some "element of [the] offense" have occurred in Pennsylvania, that "element of an offense" is defined in Crimes Code Section 103 as "conduct or attendant circumstances," that Section 103 defines "conduct" as "an action or omission and its accompanying state of mind," and that since Section 3927, *supra*, makes no requirement concerning the accompanying state of mind at the time of receipt of the property then receipt cannot constitute an "element of [the] offense" such that subject matter jurisdiction will attach. The argument cannot succeed; Section 3927 specifically requires that receipt of the property be accompanied with knowledge of an agreement or legal obligation to dispose of the property in a certain fashion. Secondly, appellants argue that since the receipt of the premium payments and the underlying brokerage agreement were legal they cannot constitute essential elements of the offense, even though "included in the description of the forbidden conduct in the definition of the offense" ("element of an offense," 18 Pa.C.S. § 103) but are merely incidental thereto. This argument ignores the fact that legal receipt or possession of another's property has always been an essential element of crimes in the nature of conversion and embezzlement. Therefore, we conclude that the lower court did not err in refusing to dismiss the indictments for lack of jurisdiction.

12. *Cf.* our construction of the statute's elements for purposes of determining the applicability of the Crimes Code or Penal Code, *infra.*

## 2.

## Jurisdiction as Question of Fact.

We next consider the correctness of the trial courts rulings on the submitted points for charge. This question also addresses the jurisdiction of the court.

"It is, of course, the law that 'the locus of a crime is always in issue, for the court has no jurisdiction of the offense unless it occurred within the county of trial. . . .' " *Commonwealth ex rel. Chatary v. Nailon*, 416 Pa. 280, 283, 206 A.2d 43, 45 (1965) quoting from *Commonwealth v. Mull*, 316 Pa. 424, 426, 175 A.2d 418, 419 (1934). Normally, the question is one of law and left to the trial judge to decide, but on rare occasions jurisdiction depends on the resolution of disputed facts. In those cases the question should be put to the jury upon proper instructions and failure to give such proper instructions may constitute reversible error. *Commonwealth v. Mull, id.; Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973).

Instantly, there were questions of fact in dispute which would have solved the jurisdictional riddle if the court had properly put them to the jury. The primary fact in dispute was, of course, whether appellants had discharged their obligation to the Commonwealth in accordance with the law. The determination of that question required first the determination of several lesser questions: in what capacity did appellants receive the insurance premiums; in what capacity did they endorse the checks; in what capacity did they deposit the monies in their account; in what capacity did they later remove the funds. Had all of this occurred in Pennsylvania there would be no problem: the standards by which appellants' actions would be measured would be the standards set up by the law of Pennsylvania. However, much of the alleged criminal activity occurred in New York and not in Pennsylvania. Although the premium checks were written in Pennsylvania by the Commonwealth, the broker, the insurance companies, and the bank into which the checks were deposited were all out of state. Most of

these lesser questions revolve around appellants' legal status vis-a-vis the New York insurance companies. It was necessary that their status in this regard have been determined before the ultimate determination of their criminality. Furthermore, that determination ought to have been made applying New York law, because it is New York which has an interest in regulating local insurance business and in defining the legal ramifications of actions within the territorial confines of New York and not Pennsylvania. *See* Leflar, Conflict of Laws: Choice of Law in Criminal Cases, 25 Case Western Res.L.Rev. 44 (1974).[13]

**13.** Leflar states the following concerning the Federal Constitutional limitations on choice-of-law in the criminal context:

The Federal Constitution, by its due process clause, sets the same outer limits on a state's power to apply its own law to extrastate facts in criminal cases as are set for civil cases. A state may not, under the clause, exercise legislative jurisdiction by applying its substantive law to a set of facts which has no substantial connection with the state. This limitation has been more fully developed by the United States Supreme Court in civil than in criminal litigation, but the rule is stated in general terms:

Where more than one state has sufficiently substantial contact with the activity in question, the forum State, by analysis of the interests possessed by the States involved, could constitutionally apply to the decision of the case the law of one or another state having such an interest in the multistate activity. [*Richards v. United States*, 369 U.S. 1, 15, 82 S.Ct. 585, 594, 7 L.Ed.2d 492 (1962).]

The due process clause precludes unrestricted application of spatially irrelevant law by a state court, to a set of facts. The full faith and credit clause, the equal protection clause, and possibly even the privileges and immunities clause of the fourteenth amendment, may buttress this result. But, as the leading case of *Home Insurance Co. v. Dick*, [281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926, (1930)] illustrates, the comprehensiveness of the due process requirement assures the result even in fact situations to which some of the other clauses could not apply. Generally speaking, the geographical locations of acts, and the effects of acts, have been the tests of legislative jurisdiction, though the tests are today often expressed in terms of state interests affected by the geographically located acts or effects. Regardless of the language, the requirement is that the acts, and the effects thereof, to which a particular state's law is to be applied, must have some substantial connection with that state.

Leflar, Conflict of Laws, *supra* at 48-49.

Professor Leflar continues, by enumerating the five major choice-influencing considerations with which the courts must deal in determining the law of which state to apply. He lists them as: 1)

■ To that end, appellants submitted points for charge. The court accepted part of each point submitted but refused to charge the jury on the remainder. The points as submitted read:

Under the law, endorsement of a check by the proper person to make such endorsement constitutes an actual and legitimate payment of an obligation. (citations omitted) *If you find from the evidence that either Defendant had the authorization of officers of The Market Facilities, Inc. to endorse said company's name on the checks of the Commonwealth and deposit them in the bank account of Charles W. Ohle, Inc., then you must find that payment* was made to the insurance company, and you must find Defendants not guilty.[14]

And,

Under the Insurance Law of the State of New York when an insurance company entrusts its policies to a broker for delivery to the insured, the broker acts as an agent for the insurance company in collecting and receiving premiums, and payment to the broker is deemed payment to the insurance company. (citations omitted) *Therefore, if you find that Defendants received payment of the insurance premium from the Commonwealth of*

predictability of results; 2) maintenance of interstate and international order; 3) simplification of the judicial task; 4) advancement of the forum's governmental interests; 5) application of the better rule of law. *Id.* at 61.

*And see*, Leflar, American Conflicts Law (3rd ed. 1977) at 224–225, where Professor Leflar states:

"One effect of this localization of prosecutions, almost but not quite unique in conflict's law, is that the question of jurisdiction and that of governing substantive law always receive the same answer. The governing law is always that of the forum state, if the forum court has jurisdiction. Judicial jurisdiction and legislative jurisdiction are identical. In this result criminal cases are different from civil suits. The "difference lies in the 'transitory' (as distinguished from 'local') character of most civil causes of action, by reason of which a cause of action that came into existence under one state's law may be sued upon in another state. Criminal claims are not transitory."

**14.** Emphasized portion is that portion not read to the jury.

*Pennsylvania, you must find that the obligation of the Commonwealth of Pennsylvania was discharged, because payment to the broker was payment to the insurer. Any subsequent failure to transmit moneys to the insurance company would not constitute a violation of the criminal statute under which Defendants are charged.*[15]

The trial judge read to the jury the first sentence of each of these suggested charges but refused to read the second parts of each. By refusing to read the second parts of these charges the trial judge was essentially refusing to submit the jurisdiction-related question presented thereby to the jury for its determination. Clearly this was error, for such a refusal denied the jury the opportunity to determine the Commonwealth's jurisdiction over appellants' action, for, although the submitted points for charge address other issues, the determination of those issues goes directly to the heart of the court's jurisdiction. The jury should have been permitted to decide whether or not Charles W. Ohle, Inc. acted as agent of Market Facilities, a New York insurance company, in accepting the premium payments, and as its agent in endorsing the checks. Such a determination by the jury was crucial. If appellants acted as agents for Market Facilities, as that relationship is defined by the law of the State of New York, then appellants' obligations to Pennsylvania were fulfilled insofar as Pennsylvania is concerned in the matter both as insured and as sovereign. If appellants acted in accordance with those provisions of the law of New York there could have been no crime under Section 3927, *supra,* and no jurisdiction in our courts to prosecute appellants failure to pay the monies over. This is so because once the checks were negotiated by appellants as agents for the insurance company and deposited in appellants' account, under New York law the monies would no longer be payments on the premium yet to be transferred to the insurance company, but funds held by appellants for their principal, the insurance company. On the other hand, if there was no

15. Emphasized portion is that portion not read to the jury.

authority in appellants to act on behalf of the insurance company, either as agents in accepting payment or as agents authorized to endorse and cash the check, then the jury could properly consider the question of appellants alleged violation of our criminal statutes since the money would not legally or actually have reached the insurance company. In short, properly the jury should have been allowed to consider the effect of the New York laws and directed to find appellants not guilty of violation of the Pennsylvania statute if their actions were in conformity with the law of New York. It was error not to have charged the jury as requested and a new trial must therefore be granted.[16]

In the appeal by Jackson, at no. 103 March Term 1978, (theft for failure to make required distribution of funds received) judgment of sentence is vacated, the conviction is reversed, and the case is remanded for new trial not inconsistent with this opinion.

In the appeal by Ohle, at no. 106 March Term 1978, (theft for failure to make required distribution of funds received) judgment of sentence is vacated, conviction is reversed, and the case is remanded for new trial not inconsistent with this opinion.

In the appeal by Ohle, at no. 119 March Term 1979, (bribery and conspiracy) judgment of sentence is vacated, the conviction is reversed, and the indictment quashed.

Jurisdiction relinquished in all three cases.

16. The Commonwealth argues that our courts would still have jurisdiction to try the case and to punish the violation of our statute appellants' actions were even if fully in compliance with the law of New York. The argument is based on the effect of appellants actions in Pennsylvania—the cancellation of the insurance contract by the Reserve Insurance Company. Because of the disposition we make of the case we need not decide the question now but note only that the tracing of the effects of crimes has not been adopted by our courts. *See Commonwealth v. Bertels, supra;* and *Commonwealth v. Creamer,* 236 Pa.Super. 168, 345 A.2d 212 (1975).