516 A.2d 689

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Henry P. FAHY, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 22, 1985.

Decided Oct. 21, 1986.

**300**

Robert B. Lawler, Marianne E. Cox, Asst. Dist. Attys., Marion E. MacIntyre, Deputy Atty. Gen., for appellee.

Daniel H. Greene, Philadelphia, for appellant.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

This direct appeal arises from the conviction and death sentence of Henry P. Fahy (Appellant) pursuant to 42 Pa.C.S. § 9711(h).[1]  Appellant was arrested on January 29,

---

1.  42 Pa.C.S. § 9711(h) provides:
    (h) **Review of death sentence.—**
    (1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

1981, and charged with Murder of the First Degree,[2] Rape,[3] Burglary,[4] and Possession of an Instrument of Crime[5]. The victim was twelve year old Nicoletta ("Nicky") Caserta.

On January 24, 1983, Appellant was tried before a jury with the Honorable Albert F. Sabo of the Court of Common Pleas of Philadelphia County presiding. The jury returned guilty verdicts on all charges on January 29, 1983. After the required sentencing hearing[6] was conducted, the jury determined that Appellant be sentenced to death. Sentencing was deferred pending the filing and disposition of post-trial motions which were argued before a court *en banc* and denied on November 2, 1983. Appellant was sentenced to death on the homicide conviction, ten to twenty years on the burglary conviction, two and one-half to five years on the weapons conviction, and ten to twenty years on the rape conviction. Appellant's burglary and rape convictions were ordered to run concurrently with each other but consecutively to the murder conviction. The weapons con-

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

**2.** 18 Pa.C.S. § 2502.

**3.** 18 Pa.C.S. § 3121.

**4.** 18 Pa.C.S. § 3502.

**5.** 18 Pa.C.S. § 907.

**6.** 42 Pa.C.S. § 9711(a)(1) provides:

(a) Procedure in jury trials.—
After a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.

viction was to run consecutively to the burglary and rape convictions. This automatic appeal followed.

Appellant first argues that insufficient evidence exists to support a conviction of murder of the first degree. As Mr. Justice Flaherty recently reiterated, "It is well established that the test of sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt." *Commonwealth v. Syre*, 507 Pa. 299, 489 A.2d 1340 (1985). *See also, Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985).

Viewing the evidence in the light most favorable to the Commonwealth, it was established that on January 9, 1981, at 7:15 a.m., Nicky Caserta received a telephone call from her girlfriend during which the girls made plans to meet and walk to school. That meeting never took place. After completing the phone conversation, since Nicky's mother had left for work, Nicky locked the door, as she had routinely done every morning. From a vantage point across the street, Appellant saw Nicky's mother leave for work. He proceeded across the street and was let in the Caserta home by Nicky. Appellant was well known to Nicky because he and Nicky's aunt were living together nearby. Appellant asked Nicky to go upstairs and look for a pair of pliers for him. As soon as Nicky went up the steps, Appellant locked the front door and followed her. Appellant then grabbed Nicky and when she began screaming, forced tissue in her mouth, wrapped a sweater around her face, and had sexual intercourse with her. Upon completing this crime, Appellant commanded Nicky to dress. Due to the child's hysterical state of mind, she put her parochial school uniform on backwards, sending Appellant into a violent rage which resulted in him dragging the child to the basement.

The bloody and battered corpse of Nicky Caserta, sprawled across the basement floor, was found by her stepfather, Paul Piccone. Upon arriving home from work, Paul and Marie Piccone noticed that their house was in complete disarray, their daughter's lunch money and house keys were untouched, and a chair had been placed against the basement door. Further investigation revealed the child's body. The police were summoned immediately. Police investigators found the body with a T-shirt and an electrical cord wrapped tightly around the neck, multiple tears to the vagina and rectum, and eighteen stab wounds to the chest area. Dr. Fillinger, the medical examiner, confirmed these findings and ruled death by homicide.

On January 29, 1981, police investigators at the Sex Crimes Unit interviewed Rosemarie Kelleher, Appellant's live-in girlfriend, questioning her regarding an alleged sexual assault by Appellant upon her six year old son, Christopher. Ms. Kelleher phoned Appellant and requested him to come to the Sex Crimes Unit for questioning regarding this rape allegation. Appellant agreed and upon his arrival fifteen minutes later, he gave his name and asked someone in the hall who he was supposed to see. Officer Carol Keenan then approached Appellant. She testified that he had no difficulty walking or talking, nor did he appear to be under the influence of drugs or alcohol. While Appellant was speaking with Officer Keenan, Detective Chitwood and Sergeant Rosenstein approached Appellant and advised him that there were two warrants for his arrest on charges of rape.[7] However, they did not, at this time, tell him the names of the victims.

Appellant was placed under arrest at 10:15 p.m., handcuffed and transported to Homicide Headquarters, where he was placed in an interview room and unhandcuffed at 10:30 p.m. At 10:45 p.m., Appellant was permitted to use the bathroom facilities and get a drink of water. Both

7. Appellant was arrested on warrants regarding two independent rapes and was questioned regarding those incidents as well as the instant charges. Probable cause existed for the arrest.

Officers also testified that Appellant appeared normal, not under the influence of drugs or alcohol, and he was generally alert and responsive.  At 10:51 p.m., background information was obtained from Appellant and he was advised that he would be questioned about the homicide of Nicky Caserta, as he was the prime suspect.  Appellant was fully advised of his *Miranda* rights.  He was told that he had the right to remain silent and not say anything at all, anything he said could be used against him, he had a right to speak to an attorney *before* questioning and to have an attorney present during questioning, if he could not afford an attorney, one would be provided free of charge, if he chose to give a statement, he could stop at any time he wished. Appellant waived his rights and initialed a printed form containing both the warnings and the questions concerning his understanding of his rights.  Appellant wanted to know why he was arrested.  He was told he was arrested for the rapes of Nicky Caserta and six-year-old Christopher Kelleher.

Appellant initially denied culpability in any of the crimes; however, after viewing pictures of the victim's body, Appellant began to cry and said, "Alright I did it, I did it."  After he regained his composure, Appellant orally related the details of the murder.  This was followed by the preparation of a written statement which began about 12:30 a.m., on January 30, 1981.  Upon completion of the written statement, Detective Chitwood read it back to Appellant and then gave it to Appellant to read.  The Officers required Appellant to read portions of the statement out loud to assure themselves that he, in fact, could read.  After reading the entire statement, Appellant then signed each of ten pages and stated that it was a true and correct statement. This was finished at approximately 2:00 a.m.  The statement provided the following facts of the murder:

> I grabbed her arm and dragged her down to the cellar. I had my other hand around her mouth.  Down in the cellar I started choking her around the neck with my hands, but it wasn't working.

I told her, I said, 'Die,' she wouldn't die. I pushed her to the floor. She kept kicking like she was gasping for air, spit started coming from her mouth. She just wouldn't die. I kept telling her, 'Bitch, you Bitch, you're supposed to die.'

So I grabbed a red cord from the washer, but before I did that I took a T-shirt from the clothesline and wrapped it around her mouth. I had the cord. I put it around her neck and started pulling on it, choking her, but it wasn't doing any good.

As I was choking her, I kept saying, 'Die, die.' She kept kicking and stuff came out of her mouth. I put my foot, this foot, (left foot indicated) on the cord. Then I used both my hands pulling the cord up to me real hard. When I thought she was dead, she wasn't moving, I let go of the cord.

Then she started choking for air again. I couldn't understand why she wasn't dying.

So I went upstairs and went into the kitchen and into the drawer in the kitchen sink near the stove. I got a knife and went back down the cellar. Her body was still jerking. I took the knife and I started stabbing her in the chest—

[At this time, he was indicating with his right hand the motion that he was stabbing her.]

—About seven times. I figured it would be enough.

I went back upstairs and took a piece of paper off the table to dry my hands after I washed them. I washed them in the sink in the kitchen. I used the same paper to open the faucet, the one with the red button.

After I dried my hands I noticed a piece of the knife was missing.

I went back downstairs to find it and I saw the piece laying about a foot away from her.

I picked it up. I saw a pair of green shorts, the color of a[n] army uniform. I rolled up the knife and the broken piece in the shorts and put it in my pocket in the thing I was wearing under my coat ...

I came up out of the cellar, shut the door, and put a chair up against the door because I thought she could be alive and come back upstairs ...

I left and got in my truck and drove over to Emerald Street. I'm not sure if it was Clearfield, but I know it was between Clearfield and Allegheny. I put everything in a brown paper bag and then threw it down the Culbert [sic]. It's about a block from Emerald and Orleans. I could probably show you. After that I went and picked up Michael for work. (N.T. 555–558)

At approximately 2:30 a.m., Appellant was given coffee and something to eat. He was then handcuffed at 2:41 a.m. and proceeded to show the Officers the location where he had disposed of the knife used to stab Nicky, which was successfully recovered from the sewer. Upon his return to the police station at 3:10 a.m., Appellant was permitted to use the bathroom facilities and get a drink of water. Appellant then made a telephone call during which he admitted to both his mother and to Rosemarie Kelleher that he raped and murdered Nicky. Appellant was then arraigned at 4:05 a.m.

On January 30, 1981, a criminal complaint was lodged against Appellant charging him with murder of the first degree, rape, burglary, and possession of an instrument of crime.

Appellant subsequently denied making the statement to the police. He claimed he did not initial the *Miranda* warnings and that, in fact, he was never advised of his constitutional rights. He did admit that the signature on the ten pages was his; however, he claimed that he signed blank pieces of paper after being promised that he would be taken to a doctor the following Monday. Appellant admitted that he told the detectives that he did it, but said he made this admission because the detectives convinced him that he did it. He also admitted that he told his mother and Rosemarie on the telephone that he raped and murdered Nicky, but said he did this only because he was confused and upset at the time, and that it was not true. Appellant

filed a Motion to Suppress the confession and the murder weapon on April 3, 1981. Said motion was argued and denied on March 19, 1983, despite Appellant's contention that he was not properly advised of his constitutional rights prior to his confession. The case then proceeded to trial.

At trial, Michael Mullen testified that he worked with Appellant and that he called Appellant at 6:45 a.m., on January 9, 1981, and was told by Appellant that he would be picked up in five minutes. However, Appellant never arrived at Michael's home until 8:10 a.m., looking pale. They left work shortly after arriving, and Appellant suggested that they return to his home because he wanted to take a shower. Later that morning, Appellant came downstairs with his thermal underwear rolled into a ball and said he was going to wash them.

Rosemarie Kelleher testified that it was very unusual for Appellant to do the wash. She also established that Appellant attempted to flee to Baltimore on the night of January 9, 1981, but he ran out of gasoline on the way and had no money. Appellant telephoned her and asked that she and his brother Harry come and pick him up. Appellant returned to Philadelphia, but did not go back to the house where he lived with Ms. Kelleher, nor did he return to work between the slaying on January 9, and his arrest on January 29.

Appellant attempted to defend himself by arguing that the victim was his friend and, therefore, he could not have committed these acts of violence against her. Appellant also asserts that the Commonwealth witnesses were incorrect in their description of the events surrounding the crimes, and that Appellant's testimony was "so much more believable than the version adopted by the Commonwealth through its witnesses" that Appellant should be granted relief.[8]

8. Appellant specifically seeks reversal of the judgment of guilt, a new trial, or such judgment as this Court's review permits.

■ The finder of fact is free to believe all, part, or none of the evidence. *Commonwealth v. Arms*, 489 Pa. 35, 413 A.2d 684 (1980); *Commonwealth v. Harper*, 485 Pa. 572, 403 A.2d 536 (1979); *Commonwealth v. Rose*, 463 Pa. 264, 344 A.2d 824 (1975). Furthermore, "It is a basic tenet of our system of jurisprudence that issues of credibility are properly left to the trier of fact for resolution." *Commonwealth v. Whack*, 482 Pa. 137, 140, 393 A.2d 417, 419 (1978).

In *Commonwealth v. Farquharson*, 467 Pa. 50, 60, 354 A.2d 545, 550 (1976), our Court stated, "where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding." However, this rule of law applies only in cases where the patent unreliability of the testimony is such as to render a verdict of guilt based thereupon as no more than pure conjecture. *Whack, id.; Farquharson, id.* (See also, *Commonwealth v. Upsher*, 497 Pa. 621, 444 A.2d 90 (1982)).

The only testimony offered to contradict the Commonwealth's evidence was that of Appellant. This contradiction basically centered around the events on the day of the murder and Appellant's penchant for young girls. More specifically, Appellant claims the testimony of the Commonwealth's witnesses concerning his location during various hours of the day in question was totally inaccurate. Appellant also testified that his relationship with the victim and the Caserta family was very friendly in nature; however, this testimony was also contradicted by prosecution witnesses. The jury clearly disbelieved the Appellant's version of the events and as was its province, credited the testimony of the Commonwealth witnesses.

■ We are satisfied that Appellant has presented no basis for disturbing the jury's verdict on the ground of insufficient evidence. Taking all of the facts of this case as a whole, a jury could conclude beyond a reasonable doubt that young Nicky Caserta's death was a homicide. From the extent of the injuries to the victim's body, a jury could reasonably infer the killing was willful and deliberate. Fur-

thermore, since Appellant left Nicky in the basement, went upstairs, got a knife and returned to stab her, the jury could reasonably conclude that the killing was premeditated. Accordingly, we are satisfied that sufficient evidence exists in this record to support the jury's verdict of murder of the first degree, and dismiss Appellant's sufficiency challenge.

Appellant next argues that the suppression court committed reversible error in denying Appellant's motion to suppress his confession and the murder weapon, which flowed from the unlawful confession.

As we stated in *Commonwealth v. Johnson*, 467 Pa. 146, 151–52, 354 A.2d 886, 889 (1976),

> ... In reviewing this ruling our initial task is to determine whether the factual findings are supported by the record. 'In making this determination, we are to consider only the evidence of the prosecution's witnesses and so much evidence of the defense as, fairly read in the context of the record as a whole, remains uncontradicted.' *Commonwealth v. Goodwin*, 460 Pa. 516, 522, 333 A.2d 892, 895 (1975). If, when so viewed, the evidence supports the factual findings we are bound by such findings; we may only reverse if the legal conclusions drawn therefrom are in error ...

See also, *Commonwealth v. Berkheimer*, 505 Pa. 506, 481 A.2d 851 (1984); *Commonwealth v. Hamlin*, 503 Pa. 210, 469 A.2d 137 (1983); *Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980); *Commonwealth v. Brown*, 473 Pa. 562, 375 A.2d 1260 (1977).

■ When faced with conflicting testimony, a suppression court, as factfinder, may pass upon credibility, and these findings will not be disturbed when supported by the record. *Commonwealth v. Guest*, 500 Pa. 393, 456 A.2d 1345 (1983); *Commonwealth v. Firth*, 479 Pa. 333, 388 A.2d 683 (1978). The record reveals and the suppression court found that the evidence introduced by the prosecution was more credible than that of Appellant, and, therefore, the court refused to grant the motion to suppress.

At the suppression hearing, Detectives Chitwood and Rosenstein testified to the events surrounding the arrest and subsequent confession. Their testimony established that Appellant voluntarily appeared at the Philadelphia Police Sex Crimes Unit and was taken to the Police Administration Building for questioning regarding two warrants for rape. Detective Chitwood proceeded to inform Appellant that he was the prime suspect in the rape and murder of Nicky Caserta. The detective advised Appellant of his constitutional rights by placing a standard police form containing the *Miranda* rights in front of him and at the same time reading the warnings to him aloud. Appellant indicated his decision to waive his rights by initialing a standard police form containing both the warnings and questions regarding his understanding of his rights. At first, Appellant denied his involvement in the Caserta killing. However, after being shown pictures of the victim's body, Appellant exclaimed, "I did it, I did it." Appellant then confessed to the crimes, giving a detailed description of how he raped and killed young Nicky Caserta. Appellant also gave the exact location of where he disposed of the murder weapon and later guided the police officers to the sewer where the knife was hidden.

After reading the statement, Appellant affixed his signature to each individual page of the ten page document.[9] Detective Chitwood testified that during the interview and confession Appellant was alert and responsive. Throughout the questioning, Appellant was neither threatened nor coerced by the police, and denied being under the influence of drugs. The complete interview lasted approximately one and one-half hours.

Appellant's testimony at the suppression hearing was totally contradicted by the testimony of the Commonwealth's witnesses. Appellant claimed his confession was not voluntarily obtained. Appellant also claims his confes-

9. Detectives Chitwood and Rosenstein requested that Appellant read a portion of the statement aloud, which satisfied them that Appellant could read and, therefore, knew what he was signing.

sion was not properly extracted, in that during the police questioning he experienced fatigue and the effects of his seizure and depression medication. We stated in *Commonwealth v. Jones*, 457 Pa. 423, 432–33, 322 A.2d 119, 125 (1974), "Intoxication is a factor to be considered, but it is not sufficient, in and of itself to render a confession involuntary." "The test is whether there was sufficient mental capacity for the defendant to know what he was saying and to have voluntarily intended to say it." *Commonwealth v. Culberson*, 467 Pa. 424, 428, 358 A.2d 416, 417 (1976). See also, *Commonwealth v. Manning*, 495 Pa. 652, 435 A.2d 1207 (1981); *Commonwealth v. Smith*, 447 Pa. 457, 291 A.2d 103 (1972).

▆▆▆ The duty of the suppression court is to determine whether the Commonwealth has established by a preponderance of the evidence that the confession was voluntary and that the waiver of constitutional rights was knowing and intelligent. *Jones, Id.* Our responsibility on review is to determine whether the record supports the factual findings of the trial court and to determine the legitimacy of the inferences and legal conclusions drawn from those findings. *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A.2d 892 (1975). Reviewing Appellant's arguments in light of the previously espoused standard, we are convinced the suppression court was correct in ruling that Appellant's statements were admissible. Our review of the conflicting testimony illustrates that Appellant, in fact, was informed of the charges against him, advised of the nature of the questioning, and cognizant of his constitutional rights.

Appellant next argues that the trial court committed reversible error in failing to sustain Appellant's motion for a mistrial as a result of prosecutorial misconduct. This issue is without merit. During the early stages of trial, defense counsel and the assistant district attorney agreed not to inform the jury that Appellant had confessed to the Caserta killing during his arrest on two warrants involving independent sex crimes. Appellant specifically alleges that

the prosecutor, during cross-examination of Appellant, asked a question designed to elicit an improper remark, namely, that Appellant had been incarcerated. The questioning went as follows:

By Miss Rubino (A.D.A.):

Q. Mr. Fahy approximately how long did you live at 2063 East Rush Street?

A. For about two years.

Q. And how often did you during that two year period did you live there?

A. Very often.

Q. For approximately how many months in the year of 1980 did you live there?

A. Months?

Q. Yes. How many of the months in 1980 did you live there?

A. As far as I know, all of them.

Q. You were never living anywhere else besides 2063 in 1980?

A. Not that I can remember; no.

Q. In 1979, how many months did you live there?

A. '79

(There was a long extended pause.)

I'm not sure. I think I was—(Pause) I think I could have been locked up for—

Mr. Greene: Objection. (N.T. 726–27, 1–28–83).

THE COURT: Strike from the record the witness' last answer to that question as not being responsive.

Mr. Fahy, would you please answer specific questions? Don't volunteer, or go into—

THE WITNESS: I'm trying to, Your Honor.

THE COURT: The question was, how many months and you can tell us how many months. Now, you can't—

THE WITNESS: Well, I am—I believe that me and Cookie [Rosemarie Kelleher] got in a few arguments and I was away from the house—oh, *for maybe about a day or two,* at my mother's or different places until Cookie

cooled down. *But, I don't believe I was ever away from the house in '79 for any month at all.* (N.T. 726–727, 730).

In *Commonwealth v. Williams*, 470 Pa. 172, 178, 368 A.2d 249, 252 (1977), the Court stated:

Although we reiterate the admonition to trial courts and prosecutors that they should exercise every possible precaution against the introduction of improper references to prior unrelated criminal activities of the accused, we nevertheless recognize that there will be situations where, even with the greatest care, such evidence may inadvertently impregnate a trial. In such a case where it is evident that the introduction of the improper reference was not intentional and the nature of the comment was innocuous, immediate and effective curative instructions may remedy the error.

Furthermore, the Court in *Williams* concluded that the nature of the reference and whether the remark was intentionally elicited by the Commonwealth are considerations relevant to the determination of whether a mistrial is required. See also, *Commonwealth v. Richardson*, 496 Pa. 521, 437 A.2d 1162 (1981); *Commonwealth v. Cannon*, 453 Pa. 389, 309 A.2d 384 (1973).

In the instant case, Appellant's improper response was unsolicited. The question posed required a number answer, not the response given. Further, Appellant's statement, "I could have been locked up," gave no indication that he had been *convicted* of a crime, nor did it reveal the nature and extent of the crime for which he had been incarcerated. Also, there are situations where the taint resulting from an improper reference to an unrelated criminal act may be expunged without resort to the extreme remedy of aborting an otherwise fair trial. *Williams, id.*

■ While Appellant's response was improper, it was unsolicited and promptly stricken from the record. Appellant's remark was unintentionally introduced into the record, and was not exploited later on during the trial or

closing arguments. This single, unintentional reference did not inflame the passions and prejudices of the jury to the extent that Appellant was denied a fair trial. The prosecutor's questioning was well within the limits of cross-examination and, therefore, no basis exists for the claim of prosecutorial misconduct.

Lastly, Appellant challenges the constitutionality of 42 Pa.C.S. § 9711(d)(9) of the Death Penalty Statute, specifically that the term "significant history," is vague and overbroad. That Section reads:

**Aggravating circumstances.**—Aggravating circumstances shall be limited to the following:

(9) The Defendant has a significant history of felony convictions involving the use or threat of violence to the person.

At the penalty stage of this proceeding, the prosecutor introduced evidence that on November 24, 1981, prior to the instant trial, Appellant was convicted of raping a seventeen-year-old girl on September 26, 1980. Also, on November 24, 1981, Appellant was convicted of attempted rape and attempted involuntary deviate sexual intercourse of a thirteen-year-old child on October 21, 1980.[10] Subsequently, the jury found three aggravating circumstances, that Appellant committed the killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), the offense was committed by means of torture, § 9711(d)(8), and the Appellant has a significant history of felony convictions involving the use of threat of violence to the person, § 9711(d)(9). Although the jury found two mitigating circumstances, that Appellant was under the influence of extreme mental or emotional disturbance, § 9711(e)(2), and that Appellant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired, § 9711(e)(3), they determined that the aggravating

**10.** On cross-examination, the prosecutor questioned Appellant concerning several other prior incidents of rape in which young children were involved. These charges were ultimately dismissed.

circumstances outweighed the mitigating circumstances and sentenced Appellant to death.[11]

Appellant now attacks the finding of aggravating circumstance § 9711(d)(9) in that the statutory language of this section is unconstitutionally vague and overbroad. Appellant explicitly argues that 42 Pa.C.S. § 9711(d)(9) is so vague that a court must *guess* what the Legislature intended by the term "significant history". In furtherance of this argument, Appellant contends that the factfinder has no guideline to determine whether "significant history" means the number of convictions, the severity of the crime stemming from the conviction, or both.

In *Commonwealth v. Beasley*, 504 Pa. 485, 475 A.2d 730 (1984), this Court reviewed an identical claim and stated:

Appellant further contends that certain language employed in the statute's enumeration of aggravating and mitigating circumstances, to be weighed by the jury in determining whether the death penalty should be imposed, are (sic) so vague as to invite arbitrary and capricious imposition of the death penalty. The challenged language includes, *inter alia*, the phrases "significant history of prior criminal convictions" (42 Pa.C.S.A. § 9711(e)(1)), "extreme mental or emotional disturbance" (42 Pa.C.S.A. § 9711(e)(2)), "age of defendant" (42 Pa.C.S.A. § 9711(e)(4)), "participation in the homicidal act was relatively minor" (42 Pa.C.S.A. § 9711(e)(7)), "capacity of the defendant ... to conform his conduct to the requirements of law ..." (42 Pa.C.S.A. § 9711(e)(3)). In reviewing an identical claim of vagueness asserted against the corresponding portion of the death penalty statute of the State of Florida, which employed virtually identical lan-

11. 42 Pa.C.S. § 9711(c)(1)(iv) provides:

**Sentencing.—**

**(c) Instructions to jury.—**

(iv) the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

guage, the Supreme Court of the United States rejected the vagueness claim, noting that a jury's evaluation of the aggravating and mitigating circumstances, as enumerated, requires no more line drawing than is commonly required of a factfinder in any lawsuit. *Proffitt v. Florida*, 428 U.S. 242, 257, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913, 925–926 (1976).

*See also, Commonwealth v. Goins*, 508 Pa. 270, 495 A.2d 527 (1985).

■ We find no basis, and Appellant has not raised any novel reasons, to ignore the holdings of *Proffitt, Beasley*, and *Goins*. Therefore, Appellant's contention that 42 Pa. C.S. § 9711(d) is vague and overbroad is dismissed as being meritless.

After oral argument, permission was given and supplemental briefs were filed by both parties concerning an inquiry made by this Court during oral argument. The issue underlying this inquiry is whether a finding by the jury in mitigation under 42 Pa.C.S. § 9711(e)(3)—substantial impairment—precludes imposition of the death penalty, notwithstanding the jury's determination that the three aggravating circumstances present outweighed the two factors found in mitigation. We conclude that it does not.

■ Our review of the death penalty statute, the record and the nature of the common law bar to execution of the death warrant where the condemned prisoner becomes incompetent after conviction convinces us that a jury finding of substantial mental impairment under § 9711(e)(3) does not bar the death penalty imposed by the jury, and that the common law rule has no application here since Appellant is not incompetent.

Appellant was ruled competent to stand trial and for sentencing, and there is nothing in the record to suggest that Appellant is incompetent and should not be executed. At the sentencing hearing, Appellant testified that he had an inner compulsion to abuse young children sexually. This evidence did not purport to establish incompetency, it was

relevant only to "impairment" and "emotional disturbance" under § 9711(e)(2) and (3). At sentencing, the defendant is free to introduce any evidence in mitigation which might persuade the sentencer to be lenient in determining his penalty. Under our legislative scheme, it is exclusively a jury question whether any mitigating factor is to be given determinative weight when balanced with other mitigating and aggravating circumstances in the case. Our legislature could have provided that a finding of substantial impairment precludes imposition of the death sentence, however, it did not do so. Instead, it determined that this factor was to be weighed by the jury along with all the other factors and that it is within the province of the jury to determine how much weight it should be accorded. We find no basis upon which to disturb the verdict and sentence of the jury.

■ Finally, in accordance with our statutory obligation [12] to review sentences of death from the standpoint of their proportionality to sentences in similar cases, *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 62, 454 A.2d 937, 961 (1982), cert. den., 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed. 1327 (1983), we have reviewed Appellant's death sentence in light of the Pennsylvania Death Penalty Study, see *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), and find the sentence to be proportionate with the penalty imposed in similar cases, considering the circumstances of the crime and the character and record of Appellant.

The convictions and the sentence of death are affirmed.[13]

12. 42 Pa.C.S. § 9711(h)(3)(iii) provides:
    (h) **Review of death sentence.—**
        (3) The Supreme Court shall affirm the sentence of death unless it determines that;
        (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

13. The Prothonotary of the Eastern District is directed to transmit the full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).

318

NIX, C.J., files a concurring opinion.

HUTCHINSON and ZAPPALA, JJ., file a dissenting opinion.

NIX, Chief Justice, concurring.

I join the opinion of the majority.

I write in response to the dissenting opinion of Mr. Justice Zappala. While I am generally in agreement with the distinction that he is attempting to define with reference to the applicability of section 9711(d)(8), 42 Pa.C.S. § 9711(d)(8), (offense committed by means of torture), I do not believe that in this factual setting it is appropriate. The gist of section 9711(d)(8) is the separate intent to inflict pain as well as the intent to take a life. Such an intent can be determined either by the express admission of such a purpose or can be determined circumstantially from the events surrounding the killing. Here I believe the circumstances justified the jury in concluding that the defendant intended not only to take the life of this young child but also to do it in such a manner that would cause excruciating pain.

HUTCHINSON, Justice, dissenting.

I reluctantly dissent. On this record, I do not believe that the definition of torture articulated by this Court in *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985), has been satisfied. In *Pursell*, we held that torture encompasses the "infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity." *Id.*, 508 Pa. at 239, 495 A.2d at 196. The *Pursell* definition requires the pain and suffering imposed on a victim to be *unnecessary*, or more than needed to effectuate the demise of the victim. Moreover, in *Pursell* there was circumstantial evidence in the form of mutilation from which an intent to cause unnecessary pain or distress could be inferred. Such evidence is not present on this record. As Mr. Justice Zappala points out in his dissent, the lack of intent does not make the present crime less heinous or horrible. The

legislature however, has defined the aggravating circumstance in question by the term "torture" instead of the broader and more flexible term "heinous."

The instant case poses the problem whether the actions of a bumbling murderer, unable to quickly realize his ghastly scheme, constitute torture. Appellant finally stabbed his victim to death after attempts at strangling with his hands, a T-shirt and a cord had failed. Albeit gruesome, the steps taken by the appellant were calculated solely to kill the victim. Accordingly, the *Pursell* definition of torture, requiring unnecessary pain and suffering, has not been satisfied. The record here excludes mitigating circumstances. The presentation of an improper aggravating circumstance to a jury, required to return a death sentence if aggravating circumstances outweigh mitigating circumstances, necessarily introduces an arbitrary and possibly unconstitutional factor into the determination of death. *Commonwealth v. Holcomb*, 508 Pa. 425, 456 n. 16, 498 A.2d 833, 849 n. 16 (1985) (Opinion Announcing the Judgment of the Court), *cert. denied*, —— U.S. ——, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986). I am therefore compelled to dissent.

ZAPPALA, Justice, dissenting.

In *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985), a majority of this Court defined the aggravating circumstance of an offense committed by means of torture, 42 Pa.C.S. § 9711(d)(8), as encompassing the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity. I dissented from this characterization of torture because it impermissibly expanded the limited circumstance provided for by the Legislature in § 9711(d)(8). I continue to believe that the definition of torture must be more carefully circumscribed. The importance of distinguishing between offenses committed by means of torture and acts which are heinous, atrocious, or cruel is demonstrated by the jury's finding of the aggravating circumstance of torture in the instant case.

Unquestionably, the brutal acts of the Appellant were of a heinous and atrocious character. It is a wearisome aspect of human existence to be time and again confronted with such violent, depraved acts of individuals. In some sense it is arguable that all killings are atrocious. It is clear, however, that not all killings are properly made subject to capital punishment. Due process and fairness considerations of constitutional magnitude require that the decision to impose this "extreme sanction, suitable to the most extreme of crimes," *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 189, 96 S.Ct. at 2932.

To this end, the General Assembly has defined in specific terms the *only* circumstances under which the death penalty might be appropriate in this Commonwealth. 42 Pa.C.S. § 9711(d). Although the United States Supreme Court has found no constitutional infirmity in statutory language imposing capital punishment for "especially heinous, atrocious, or cruel" murders if properly restricted, *Proffitt v. Florida*, 428 U.S. 242, 255, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia*, 428 U.S. 153, 201, 96 S.Ct. 2909, 2938, 49 L.Ed.2d 859 (1976), our General Assembly has chosen not to invoke the death penalty for all such depraved conduct. As I noted in *Pursell*, the legislature specifically rejected an amendment phrasing the aggravating circumstance in terms of the murder being "especially heinous," and opted for the present terminology, that the offense was "committed by means of torture." I reiterate my observation that these two categories are not co-extensive. While all torture may by definition be considered to be heinous, atrocious, or cruel, not all heinous, atrocious, or cruel conduct is torture. This Court exceeds its authority by ignoring the restrictive terms chosen by the General Assembly and making the death penalty applicable to a broader range of cases. In addition to usurping the legislative prerogative of defining the narrow circumstances appropriate for the imposition of capital punishment, by allow-

ing for an expansive definition of statutory language the Court rapidly approaches a point where the aggravating circumstance is applied without meaningful guidance. Although the statement by the Appellant cited by the majority demonstrates that the Appellant intended to cause the death of the victim, he did not act with the intention to cause pain and suffering through the continued or prolonged infliction of physical or mental abuse upon the victim. Until such a distinction is drawn, juries will continue to impose the death penalty upon a finding of torture for particularly gruesome and offensive murders, as it did in the instant case. As a result, this Court will have created the very risk of wholly arbitrary and capricious action by juries which the Constitution forbids and which the Legislature painfully sought to avoid by carefully delineating the circumstances under which the death penalty may be imposed.