585 A.2d 525

**COMMONWEALTH of Pennsylvania**

v.

**Anthony D'ANGELO, Appellant.**

Superior Court of Pennsylvania.

Argued May 31, 1990.

Filed Jan. 24, 1991.

410

Alfred Marroletti, Philadelphia, for appellant.

Maxine Stotland, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before ROWLEY, WIEAND, OLSZEWSKI, MONTEMURO, BECK, KELLY, POPOVICH, JOHNSON and FORD ELLIOTT, JJ.

MONTEMURO, Judge:

This appeal comes before an en banc court on the Commonwealth's petition for reargument following our reversal of appellant's bench conviction on two counts of violating 18 Pa.C.S.A. § 4701, Bribery in official and political matters. The sentence imposed was two years non-reporting probation and a $5,000 fine. We reverse.

The convictions stem from appellant's acceptance, on two separate occasions, of cash handed to him by an undercover police officer investigating allegations of corruption in the Philadelphia Bureau of Licenses and Inspections. Appellant, the supervisor of district one, covering much of downtown Philadelphia, was approached by Detective Edward Dooley posing as a financial consultant for a group of investors interested in center city property, who "needed the cooperation of L. & I." (N.T. 7/14/87 at 22) Appellant had been named by another district supervisor as the person who "knew it all in Center City." (N.T. 7-14-87 at 20). All of Officer Dooley's contacts with appellant, whether in person or over the telephone, were electronically recorded.

■ The principal issue presented is whether the evidence is sufficient to support appellant's conviction.[1]

The statute under which appellant was prosecuted, 18 Pa.C.S.A. § 4701 reads as follows:

§ 4701. **Bribery in official and political matters**

(a) **Offenses defined.**—A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

(1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient;

(2) any benefit as consideration for the decision, vote, recommendation or other exercise of official discretion

---

1. In view of our resolution of this question, we need not address the remaining issues presented in this appeal.

by the recipient in a judicial, administrative or legislative proceeding; or

(3) any benefit as consideration for a violation of a known legal duty as public servant or party official.

Before surveying the circumstances surrounding each of the incidents charged in this case, we reiterate the time-honored standard against which challenges to sufficiency of the evidence must be measured:

The test of the sufficiency of the evidence in a criminal conviction is whether, accepting as true all the evidence and all the reasonable inferences therefrom, upon which if believed the [factfinder] could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime or crimes of which he has been convicted.

*Commonwealth v. Thomas*, 465 Pa. 442, 445, 350 A.2d 847, 848 (1976).

The evidence offered by the Commonwealth at trial consisted mainly of the testimony of Officer Dooley, as the tapes were not utilized by the prosecution.[2] The officer's version of the most critical portions of the exchange differ significantly from the transcripts, and are informed by his assumptions as to the meaning of appellant's words rather than by any empirical knowledge of wrongdoing. The contact in L & I who had originally referred Officer Dooley to appellant had himself accepted money during the course of the investigation. On the basis of his previous experience, therefore, Officer Dooley acted upon the tip in anticipation that the objective of the operation, that is, discovery of corruption was in fact fulfilled at that point.

Our review of the record in this case included the testimonial as well as transcribed versions of appellant's exchanges with the undercover officer. Upon comparing Officer Dooley's evidence at trial with the documents recording the exact words of the parties, we became convinced that his testimony is grounded so firmly in preconceptions as to

---

**2.** Transcriptions of the taped conversations were offered into evidence by the defense.

render meaningless his pronouncements of what transpired at his meetings with appellant.[3] Despite the fact that all reasonable inferences must inure to the verdict winner, *Commonwealth v. Derr*, 501 Pa. 446, 462 A.2d 208 (1983), evidence, either circumstantial or direct, must be offered to support them.[4] We cannot say unequivocally that such evidence exists here. In *Derr*, our supreme court found that although the appellant had arranged with an undercover police officer to procure hashish, had received money therefor, and had delivered as promised, there was no proof of appellant's agreement with a third party to support a conviction for conspiracy. We find the analogue with the instant case instructive.

The first charged offense occurred at the conclusion of a lunch in a French restaurant chosen by the detective.[5] After discussion of the detective's "needs as a business consultant" (N.T. 7/14/87 at 21), and of his "clients'" intention to invest substantial sums of money in the Philadelphia real estate market, appellant was reported to have responded, "anything I can do for you, you know, I'll do anything I can." (N.T. 7/14/87 at 22) Appellant was also reported to have offered the services of his inspectors to examine proposed investment sites, but without knowing why, in order to provide the speculators group with information on the condition of the buildings for investment

**3.** The dissent argues that the Commonwealth forbore to introduce the tapes or transcriptions of appellant's conversations with Officer Dooley because they were inconclusive. Our review of the transcribed material convinces us, however, that the only way the Commonwealth's burden could be sustained is by use of glosses on the actual conversations rather than the words themselves. Rather than inconclusive, the conversations were in fact adverse. The dissent itself notes that we must examine all the evidence of record. We are particularly compelled to do so where the conviction is based not on solid evidence, but upon a witness' conjecture and speculation as to someone else's motives.

**4.** The trial court's Opinion offers us no guidance, as it merely recites the issues raised, and concludes without analysis that none contain substantive legal merit.

**5.** Appellant had originally suggested the Mall Tavern, described as a neighborhood bar, as a meeting place. However, because the Tavern is frequented by police officers, Officer Dooley arranged an alternative rendezvous.

purposes. As the discussion concluded, Detective Dooley handed appellant his business card and three one hundred dollar bills.

On a later occasion, after appellant had accompanied the detective on an hour and a half tour of properties he felt to be suitable for development, Dooley fanned out a group of twenty and fifty dollar bills and presented them to appellant, who selected a fifty and exited the vehicle.

During the course of the relationship between appellant and the supposed investment consultant, appellant offered advice and information on a number of topics, such as the availability of certain properties, and the best way of handling certain situations which had arisen, e.g., a problem with some plumbing installation which was not done according to the Municipal Code, and for which a violation had been issued by L & I. However, as appellant's supervisor testified, the information supplied was readily available to members of the public. The tactical advice, given in response to Detective Dooley's attempts at subornation, were consistently exhortations to do things according to established protocol. Again using the plumbing violation as an example, the detective was told not to himself interfere or to employ any third person, but to hire a registered plumber to handle the problem. He was also told at various times to work with a good zoning lawyer, to acquire all permits before spending even $.25 on a project, to approach the Redevelopment Authority with prospective plans, and in all respects to follow the rules. There was never an offer by appellant to perform any non-legitimate service, and no request from the detective meant to elicit such a response was successful.

■ This court in *Commonwealth v. Clarke*, 311 Pa.Super. 446, 449, 457 A.2d 970, 972 (1983), held that:

Under the Crimes Code section proscribing bribery in official and political matter, once the offer to confer the proscribed benefit, or once an agreement is made, the crime is complete.

The statement of the *Clarke* court that only the benefit need be conferred for the crime to be complete, is slightly misleading, and depends for its validity upon context as an examination of the caselaw makes clear. In *Clarke* itself, both the benefit and the desired (official) act were clear to all participants: appellants, tavern owners, wished the cooperation of a police officer in circumventing the Pennsylvania Liquor Code. In *Commonwealth v. Ohle*, 291 Pa.Super. 110, 435 A.2d 592 (1981), also, an agreement had been reached. Specifically, the parties had determined that appellants would receive kickbacks on government automobile insurance contracts from the Director of the Pennsylvania Bureau of Insurance. In *Commonwealth v. Weselyk*, 268 Pa.Super. 569, 408 A.2d 1149 (1979) appellants, Commonwealth revenue officials, offered to split sales taxes due on the informant's airplane. In each of the instances cited the terms under which the parties were operating had been made clear from the outset. Although appellant in the instant case received money, there is no mutual understanding evident. Neither a true offer, nor any agreement is discernable. *See also, Commonwealth v. Peetros*, 517 Pa. 260, 535 A.2d 1026 (1987); *Commonwealth v. Clapps*, 355 Pa.Super. 80, 512 A.2d 1219 (1986), *aff'd* 520 Pa. 305, 554 A.2d 10 (1989).

The question, therefore, is whether appellant's acceptance of the money, in conjunction with his expression of cooperation, transforms his general promise into a discrete agreement to "violate a known legal duty" [6] which falls within the ambit of the statute.

---

**6.** During trial, the Commonwealth submitted into evidence the Philadelphia Code § 20–604(1), which reads as follows:

No member of Council or other City officer or employee, shall solicit, accept or receive any gift, loan, gratuity, favor or service of substantial economic value that might reasonably be expected to influence one in his position in the discharge of his official duties, from any person, firm, corporation or other business or professional organization.

The Commonwealth also provided the trial court with Section 10–105 of the Philadelphia Home Rule Charter.

No officer or employee of the City and no officer or employee whose salary or other compensation is paid out of the City Treasury

Appellant's offer of help is viewed as unequivocal evidence of his willingness to perform illegal act or acts, and in fact forms the major underpinning of the charge. However, it is to be noted that nowhere does there appear discussion of payment, or indeed of any quid pro quo. Just prior to the hand-over, appellant described what he felt to be his duty under the circumstances as he saw them—he owed his cooperation to any legitimate person willing to spend such significant sums in the city as he understood was the investors' intention. It was only after that the money changed hands, and there is no indication that appellant was aware it was coming.

Further, what appellant meant by his cooperation becomes clear in his responses to Officer Dooley's suggestions of improper activity, e.g., removal of a violation. At no time did appellant react to these overtures with anything other than directives that Officer Dooley should follow the rules. No understanding of what service appellant was to perform is ever made clear, there was admittedly no direct request for anything illegal, and the information which passed from appellant to the investor were matters of public knowledge. Therefore, while we find appellant's acceptance of the money to have been unwise, indeed, highly inappropriate, there is nothing in the record which supports interpreting his acceptance as a bribe under the Act; the statutory requirement that there be some exchange involved is totally lacking. The existing caselaw offers an interesting counterpoint.

shall solicit or accept any compensation or gratuity in the form of money or otherwise for an act or omission in the course of his public work.

These provisions are alluded to the Commonwealth's brief; however, its argument, presented at trial, is not before us. That argument posits as the legal duty violated by appellant's acceptance of the money from Officer Dooley the policy embodied in the Code and Charter sections. Since the policy is to disallow acts such as appellant's, the argument becomes circular: he violated his legal duty not to accept money by doing so. This has no appreciable effect on the determination of whether a violation of 18 Pa.C.S.A. § 4701 has occurred.

In arguing that the requirements of § 4701 have been met, the Commonwealth emphasizes that appellant agreed to assist the erstwhile investor in locating properties, and in "smoothing" over any problems which might arise with L & I. However, as the record reveals, nothing illicit was done in regard to either of these promises, which, from their equivocal nature may never have been intended to be improper. We have only Officer Dooley's interpretation of the words, an interpretation which is not necessarily supported by a recitation of the words themselves as they appear in transcription, and which is actually belied by appellant's actions. While the Commonwealth states that any expectation of intelligible agreement between the parties is unreasonable, since the language of illegal compact must necessarily be guarded, the cases cited above demonstrate that lucidity is in fact commonplace. The Commonwealth's further insistence that the terms of the contract exist and are clear, i.e., fee for service, throws us back upon the parties' own words which fail to compel an interpretation of intended illegality. We are therefore back where we began, with appellant's wholly inappropriate, although not illegal acceptance of cash. This alone is not sufficient to activate the statute, or to prove his guilt beyond a reasonable doubt.

The equivocal nature of the understanding between the parties is demonstrated again by the officer's testimony regarding appellant's alleged offer to provide the investors with the results of "courtesy inspections" of prospective investment sites. These reports would be prepared by appellant's subordinates without knowledge of their purpose. The transcript of this conversation does not clearly indicate that such an arrangement was contemplated by appellant. Instead, the officer provides his interpretation of the conversation filtered though the preconception that appellant was ready and willing to act in violation of his legal duty. The record fails to support his premise.

The Commonwealth would prefer that we examine this case only from the perspective of Officer Dooley, and that

we ignore whatever does not comport with his view. However, as the standard for assessing the sufficiency of the evidence indicates, we are obligated to accept as true all of the evidence upon which the factfinder could have based its verdict, not merely that portion of the evidence proffered by the prosecution. Moreover, we need only consider the reasonable inferences to be drawn from all of the evidence, not those which proceed from the interest of a witness in the outcome. We are led by the conflicts between the testimonial and the transcribed versions of events to conclude that there is reasonable doubt as to whether the requirements of the statute are met.

The second charge grew out of appellant's offer to provide the officer with a guided tour of investment possibilities.[7] Appellant's supervisor testified with regard to this incident that nothing appellant told the detective was other than public information, and that nothing prohibited such a tour except the press of work and a one hour lunch policy.

In fact, appellant's behavior tracks a Model Penal Code Comment appearing in S. Toll, *Pennsylvania Crimes Code Annotated* (1974) at 526.

> Section ... [4701] follows prevailing law in proscribing bribery in decision-making ... this makes it clear that the bribery section does not apply to: (a) situations where the law contemplates payment of fees for services rendered by a public servant; or (b) tips or other compensation for services rendered by a public servant consistently with his duties. We recognize that the practice of tipping or paying minor officials for services which it is their duty to perform gratis is an evil against which administrative and legislative action is appropriate. However, the practice is widespread and even open in some quarters, indicating that community standards of behavior in this area have not yet crystallized sufficiently to warrant the application of penal sanction in most cases. Accordingly, the

---

**7.** It is worthy of note that none of the properties on the tour, which took place in an area known as Northern Liberties, were in appellant's administrative district.

primary means of social control should be by enforcement of discipline within the civil service, and by special legislation carrying minor penalties, outside the Penal Code.

In accord with this comment, we conclude that appellant's receipt of money in return for his investment "advice" and distribution of public information is simply insufficient to constitute a violation of § 4701.[8]

Therefore, lacking evidence either of overt action, or an agreement to take such action, we find no proven violation.

Judgment of sentence vacated.

JOHNSON, J., dissents in which ROWLEY, WIEAND and BECK, JJ., join.

JOHNSON, Judge, dissenting.

I agree with the majority that the evidence was insufficient to sustain the second count of appellant Anthony D'Angelo's conviction for bribery involving his acceptance of $50.00. However, I would conclude that the evidence, which consists primarily of Officer Dooley's testimony, is sufficient to sustain the bribery conviction for accepting $300.00 as consideration for D'Angelo's promise to violate his duties as a public servant. A reviewing court may not, as does the majority, revisit the trial court's decision that Dooley's testimony was credible, reject it and then determine that the remaining evidence is insufficient. Because Officer Dooley's testimony provides sufficient evidence to convict D'Angelo, I must dissent.

At trial, the Commonwealth relied principally upon Dooley's testimony. It was D'Angelo who introduced the transcripts of the taped conversations into evidence, apparently

---

**8.** The text of the remarks quoted above provides a gloss on the actual Comment to § 4701, which reads as follows:

This section extends bribery to cover all public employees. Under this section the crime is limited to bribery in connection with decision-making; consequently, it does not apply to situations where the law contemplates payment of fees to the public servant for his services or to tips given to a public servant. While the practice of tipping is not condoned, it is recognized that such practice is widespread.

while Dooley was on the stand. D'Angelo's defense was that the transcripts did not support Officer Dooley's interpretation of the conversations. This defense, though plausible, failed; the factfinder found Dooley credible despite the transcript. Although the transcripts lacked coherence, partly because the tape was inaudible in places, they do not contradict Dooley's testimony. The majority concludes that the parties' words, as testified to by Dooley, when considered along with the transcripts, fail to compel an interpretation of intended illegality:

> We have only Officer Dooley's interpretation of the words, an interpretation which is not necessarily supported by a recitation of the words themselves as they appear in transcription, and which is actually belied by appellant's actions.

Opinion by Montemuro, J. at 416–418.

The majority improperly substitutes its own credibility determination for that of the factfinder, in this case, the trial court. It is a basic tenet of our system of jurisprudence that issues of credibility are properly left to the trier of fact for resolution. *Commonwealth v. Fahy*, 512 Pa. 298, 308, 516 A.2d 689, 694 (1986). The finder of fact is entitled to give credence to witnesses' testimony, and we must defer to the court's determination of Dooley's credibility and acceptance of his recollection of the meeting. The significant phrase in our standard of review is "all the evidence and all the reasonable inferences therefrom, upon which *if believed* the [factfinder] could properly have based his verdict."

While a jury is not permitted to return a guilty verdict where the evidence offered is so unreliable or contradictory as to make any verdict based upon it pure conjecture, *Commonwealth v. Farquharson*, 467 Pa. 50, 60, 354 A.2d 545, 550 (1976); *Commonwealth v. Maute*, 336 Pa.Super. 394, 406, 485 A.2d 1138, 1144 (1984), this rule applies only to those cases in which the testimony is so patently unreliable that any decision based upon it would be pure conjecture. *Commonwealth v. Upsher*, 497 Pa. 621, 625, 444 A.2d 90,

92 (1982). Contradictions by other witnesses and prior inconsistent statements affect the credibility of the witness and do not render testimony patently unreliable under the *Farquharson* standard. *Id.*

We have written, with regard to the function of credibility in determination of a verdict:

> Mere evidence of a conflict in the prosecution's evidence is not fatal to its case, ... because the Commonwealth is not bound by everything its witnesses say, and the jury can believe all, part, or none of the testimony (citation omitted). The applicable standard is whether the evidence, taken as a whole, would support a verdict. *Commonwealth v. Farquharson*, [467 Pa. 50, 60, 354 A.2d 545, 550 (1976)].

*Maute*, 336 Pa.Super. at 406, 485 A.2d at 1145. In other words, construing evidence in the light most favorable to the Commonwealth does not mean merely that we are to look only to the Commonwealth's evidence. Even if the Commonwealth's evidence is contradictory and inconclusive in itself, we must look to the entire record to find enough evidence to constitute sufficiency; we grant great deference to the finder of fact. Of course, in doing this we disregard the evidence which does not support the verdict. That a reviewing court must look at the evidence taken as a whole *if the Commonwealth's evidence alone is insufficient* to support the verdict rendered cannot mean what the majority implies, that a reviewing court may disregard the trial court's credibility determinations and re-examine evidence on both sides of a credibility conflict.

The majority's analysis, although set forth as a sufficiency determination, actually amounts to a re-examination of the weight of the evidence; it ultimately examines *all* the evidence, not just the evidence encompassed by our standard of review for sufficiency. Although D'Angelo abandoned the challenge to the weight of the evidence on appeal, I will respond to the majority's discussion that essentially reviews the weight of the evidence.

In reviewing a challenge to the weight of the evidence, we start with the presumption that the evidence was sufficient and examine whether, nevertheless, the evidence preponderates so heavily against the verdict that a serious miscarriage of justice may have occurred. *Commonwealth v. Vogel*, 501 Pa. 314, 461 A.2d 604 (1983), *cert. denied, Vogel v. Pennsylvania*, 465 U.S. 1104, 104 S.Ct. 1603, 80 L.Ed.2d 133 (1984); *Commonwealth v. McLean*, 396 Pa.Super. 23, 578 A.2d 4 (1990). Under this standard, assuming that the transcript of the taped conversations were totally inconclusive, we still have Officer Dooley's testimony, which we may not discount once the factfinder accepts it as credible. As the Supreme Court of Pennsylvania wrote in *Commonwealth v. Farquharson:*

> Traditionally under our system of jurisprudence, issues of credibility are left to the trier of fact for resolution. (Citations omitted). While there may be some legitimacy for a trial court, who has also observed the witnesses as they testified, to consider the weight of the evidence and to that extent review the jury's determination of credibility, there is surely no justification for an appellate court, relying solely upon a cold record, to exercise such a function.
>
> > "On appellate review of a criminal conviction, we will not weigh the evidence and thereby substitute our judgment for that of the finder of fact. *Commonwealth v. Woodhouse*, 401 Pa. 242, 261, 164 A.2d 98 (1960). To do so would require an assessment of the credibility of the testimony that is clearly not our function."

*Commonwealth v. Farquharson*, 467 Pa. at 59–60, 354 A.2d at 550 (additional citations omitted).

The majority does not assert that Officer Dooley's testimony, taken by itself, is insufficient. In its ensuing analysis of the sufficiency/weight of the evidence, the majority, having decided that Dooley's testimony is not credible, completely disregards it and examines only the transcript. This a reviewing court may not do. Dooley's testimony, which was proper evidence before the factfinder, contains

sufficient evidence which, if believed, supports a conviction for bribery of a public official. Officer Dooley's testimony constitutes the entire body of evidence in support of the guilty verdict. We may not disregard it.

Furthermore, as a witness, Officer Dooley was not testifying as a mere "interpreter" of a cold transcript. If he were, and if his testimony were challenged, it might not have been admissible. I reject the suggestion that Dooley's testimony may have been improper for this reason, and for the reason that, as an undercover police officer, Dooley was "interested" in the outcome of the case. Dooley testified because he himself was a party to the conversation; not only did he hear the words spoken, but he was a participant in the exchange and was in a unique position to comment upon it. D'Angelo's defense hinged entirely upon his effort to use the transcript to discredit Dooley's testimony, a defense that failed.

> Here follows the relevant testimony of Officer Dooley:
> Q. What if anything happened after you met Mr. D'Angelo there?
> A. Mr. D'Angelo came back to the table that I was sitting at, introduced himself and, of course, I introduced myself and I explained to him who I was and what I needed from [the Bureau of Licenses and Inspections]. I said we were going to be—when I say "we", my company—was going to invest quite a bit of money in the Center City area, preferably around the convention center, and I needed the cooperation of [the Bureau]. I didn't want any problems, I was here to smooth over any possible problems that would arise from [the Bureau] during the purchasing and construction of the buildings.
> Q. What if anything did Mr. D'Angelo tell you?
> A. ... And he said at that time, "Anything I could do for you, you know, I'll do, anything that I can"—
>
> . . . .
>
> Mr. D'Angelo said anything he could do, he would do for me. I said to him, I told him, "I shouldn't be telling you

this, but I had developed contacts in the Redevelopment Authority," and he said good. I said this contact had given me selected locations in the Center City area and I was wondering if he might, if I gave him these locations, would he be able to check them out for me to see if there were any violations, and if there were violations in existence, could he have them removed, the sites themselves, [sic] would they be good investment sites, and so forth.

. . . .

Q. Did Mr. D'Angelo tell you if he would check out these addresses for you?

A. Yes, he did. He said he would help me with ordinances, with zoning information and things of that nature.

Q. Was there any conversation that you had with Mr. D'Angelo, Detective Dooley, concerning use of other people in Mr. D'Angelo's department?

A. Yes. He said if I supplied him with information, with addresses, he would be able to use his department personnel, building inspectors, to go down to those addresses and examine the properties. Of course these men would not know, Mr. D'Angelo said, what they were looking at; he would just tell them to go down and inspect the building and they'd come back with a report, and that report would be relayed to me.

Q. Did you at any time during the conversation give any money to Mr. D'Angelo, Detective Dooley?

A. Yes. Towards the end of the luncheon I explained to Mr. D'Angelo that I appreciated his assistance and promise of assistance in helping me, and I handed him a business card with three one hundred dollar bills, which he accepted and put in his pocket and said, "It's a pleasure." (emphasis added).

N.T., 7/14/87 at 21–25. With this testimony, the elements of a violation of § 4701 are before the factfinder: 1) that the individual is a public servant, that he solicited or agreed to accept money or another benefit, and that he agreed to

violate a known legal duty or other exercise of discretion. *Commonwealth v. Goldbard,* 276 Pa.Super. 193, 197, 419 A.2d 161, 163 (1980).

The trial court as the finder of fact could reasonably have found from this testimony that an agreement was formed. Dooley's testimony establishes that D'Angelo's proposed performance of illegal acts was discussed openly and unequivocally, after which Dooley expressed his appreciation for what D'Angelo said he would do. D'Angelo accepted the $300.00 stating "It's a pleasure." The promise to utilize city employees to inspect sites on city time for the sole purpose of rendering private advice without the knowledge of the employees involved is a violation of a known legal duty or an abuse of his discretion. D'Angelo accepted $300.00 in consideration for that promise. Thus, the requisites of the bribery statute are satisfied. That D'Angelo had yet to perform any discretionary acts on Dooley's behalf is of no consequence. Once an offer or agreement is made, the crime of bribery is complete. *Commonwealth v. Ohle,* 291 Pa.Super. 110, 435 A.2d 592 (1981).

Finally, the majority places undue reliance upon the Official Comment to § 4701 as authority for reversing D'Angelo's conviction. While Official Comments can be used in some instances to assist in the application of statutes, *see* 1 Pa.C.S. § 1939, I do not agree with the attempted application of the Comment in this case. The Comment recognizes and accepts the practice of tipping because it is so widespread. However, the practice is not condoned. Most important, I disagree with the majority that D'Angelo's acceptance of the $300.00 was a tip. Tips normally are received subsequent to performing an act. Here D'Angelo had yet to perform any act necessary to warrant such an extravagant tip. This discrepancy is further magnified by the fact that D'Angelo was offered and accepted a $50.00 payment after spending two hours escorting Dooley around Philadelphia.

For these reasons, I would affirm the judgment of sentence of the trial court with respect to D'Angelo's convic-

tion for bribery in political matters for his acceptance of the $300.00 payment. I therefore dissent.

ROWLEY, WIEAND and BECK, JJ., join.